In re Petition Pursuant to Section 304 of the Bankruptcy Code of BANCO NACIONAL de OBRAS Y SERVICIOS PUBLICOS, S.N.C., as Trustee of the Estate of Aeronaves de Mexico, S.A. de C.V., a debtor in a bankruptcy proceeding under the laws of the United Mexican States.

Bankruptcy No. 88 B 10870 (TLB).

United States Bankruptcy Court,
S.D. New York.

Sept. 30, 1988.

**662**

sion, pitting against one another strong policies relating to the formation of collective bargaining agreements and the extraterritorial recognition of foreign bankruptcies. Unfortunately, the question of which policy must yield has no clear answer; resolution requires examination of underlying congressional concerns and analogy to the automatic stay imposed in a full-scale bankruptcy case, which, of course, this is not.

Cleary, Gottlieb, Steen & Hamilton, by George Weisz, James W. Pharo, and Proskauer, Rose, Goetz & Mendelsohn by Edward Brill, Saul G. Kramer, New York City, for petitioner.

Guerrieri, Edmond & James, Washington, D.C. by Edgar N. James, Robert S. Clayman, and Shapiro, Shiff, Beilly, Rosenberg & Fox, New York City by Sidney Fox, Gerald Richman, for the Intern. Ass'n of Machinists & Aerospace Workers.

## DECISION ON MOTION FOR RELIEF FROM SECTION 304 STAY

TINA L. BROZMAN, Bankruptcy Judge:

The International Association of Machinists and Aerospace Workers and IAM District Lodge 142 (the IAM) ask that, over the objection of Banco Nacional de Obras y Servicios Publicos, S.N.C. (Banobras), the Mexican bankruptcy trustee of Aeronaves de Mexico, S.A. de C.V. (Aeronaves), I modify a preliminary injunction granted in this ancillary bankruptcy to permit the IAM to continue prosecuting in the district court an action for a judgment declaring that there existed a collective bargaining agreement between the IAM and Aeronaves. The issue presented is one of first impres-

### I.

Aeronaves, owned by agencies of the Mexican government, operated Mexico's national airline, known as "Aeromexico." As a result, in major part, of labor strife in Mexico, Aeronaves commenced a bankruptcy proceeding under Mexican bankruptcy law effective April 15, 1988.[1] On April 21, 1988, Banobras moved pursuant to section 304 of the Bankruptcy Code (the Code) by order to show cause for preliminary injunctive relief. The order to show cause contained a temporary restraining order, extended from time to time with the consent of Aeronaves' major creditor constituencies, which, with a couple of exceptions not here relevant, restrained American creditors from pursuing in any court other than the Mexican bankruptcy court or this court claims against Aeronaves or its property in this country. On June 22, 1988 at the adjourned hearing on the preliminary injunction motion, I entered an order again on consent of the debtor's major creditor constituencies (the Consent Order) which provides, in pertinent part, an injunction of limited duration granting substantially the same relief as did the temporary restraining order.[2]

Aeromexico conducted business in the United States as well as Mexico. It employed approximately 12,000 workers in

---

**1.** Although that bankruptcy was filed as a liquidation, there being no cognate in Mexico to our chapter 11, Banobras has steadfastly represented to this court that the Mexican bankruptcy court is, in effect, attempting to reorganize Aeronaves. It is hoped that the creditors with valid claims will be paid all or a very substantial portion of their debt, that the airplanes leased to Aeronaves will be leased to a new entity which will operate the airline and that the necessary employees will be rehired by the new entity. If this all occurs as planned, ownership of the new entity will initially reside in the Mexican government or its agencies but will eventually be sold in whole or substantial part to the private sector.

**2.** It must be noted that the IAM did not acquiesce in the granting of an injunction only to then seek its modification. The IAM at all times reserved its right to seek to modify the injunction.

Mexico and 500 elsewhere, of whom 350 in the United States are represented by the IAM. The IAM, on behalf of these employees, entered into two collective bargaining agreements with Aeronaves which became effective on June 1, 1983 and amendable on May 31, 1986 (the 1983 Agreements). The IAM alleges that following extensive negotiations, Aeronaves and the IAM on March 14, 1987 entered into an agreement modifying the 1983 Agreements (the 1987 Amendment). The 1987 Amendment provided that all provisions of and amendments to the 1983 Agreements were to remain in full force and effect except as specifically amended. The 1987 Amendment further set forth specific wage and benefit reductions to be effective through March 1990. The term of the concessions was contingent upon Aeronaves' obtaining identical relief from the International Brotherhood of Teamsters within 120 days. If this contingency were not satisfied, the concessions would terminate and the wages and benefits would "snap-back" to the levels provided in the 1983 Agreements.

On September 17, 1987, the conditions allegedly not having been satisfied, the IAM notified Aeronaves that the terms of the 1983 Agreements should be reinstated. Aeronaves protested the IAM's position and in December 1987 wrote to the IAM that there was no existing contract between them.

On March 24, 1988, the IAM commenced an action in the Southern District of New York against Aeronaves for declaratory and injunctive relief (the IAM Action). The complaint alleges that Aeromexico is a common carrier by air engaged in commerce as defined in section 201 of the Railway Labor Act (RLA), 45 U.S.C. § 181, and is subject to the provisions of the Act. The IAM seeks a declaration that the 1983 Agreements are in full force and effect and that Aeronaves is violating the RLA by refusing to honor the relevant terms of the 1983 and 1987 Agreements. Further, the IAM seeks to have the district court determine rights pursuant to the 1983 and 1987 Agreements.[3] Aeronaves filed an answer on April 13, 1988 in which it denied most of the allegations and asserted the defense that the district court is without jurisdiction. The IAM Action is stayed as a result of the Consent Order.

It was only a few days after Aeronaves filed its answer in the IAM Action that it commenced its bankruptcy case in Mexico. The Mexican bankruptcy court has permitted the rejection of any labor contracts between Aeronaves and its various unions, including the IAM. Because the claims of its members against Aeronaves are bottomed on the existence of a collective bargaining agreement, the IAM requests the right to have the district court determine, pursuant to American labor law, whether a collective bargaining agreement was in existence on the date of Aeronaves' bankruptcy and, if so, what rights flowed from it. The IAM recognizes that it cannot execute on any award for monetary damages, but urges that the relief requested is essential to a complete and accurate assessment of the claims of the American employees against Aeronaves. It is forcefully argued that no one individual employee resident in the United States has the requisite incentive and financial wherewithal to litigate in Mexico whether there existed under the laws of the United States a collective bargaining agreement and what its terms may have been.

Banobras responds that (i) the prospective relief sought in the IAM Action is moot in light of the termination of the claimed collective bargaining agreement by the Mexican bankruptcy court and Aeronaves' intention not to operate in the United States during the pendency of the bankruptcy,[4] (ii) the claims arising from the breach of any collective bargaining agreement, while not moot, should be determined by the Mexican bankruptcy court which would assertedly handle the claims more speedily than would the district court, and

---

**3.** The IAM Action also sought other relief which the IAM has voluntarily forsaken. Its motion for relief from the injunction is limited to the declaratory relief.

**4.** Banobras has recently indicated that it may resume limited operations here.

(iii) the IAM will not be unduly prejudiced if the motion is denied. Because the IAM requests only declaratory relief relating to the existence and calculation of claims arising from the breach of the alleged contracts, there is no issue of mootness.

## II.

■ An injunction was granted to Banobras in aid of the foreign proceeding and to prevent individual American creditors from arrogating to themselves property belonging to the creditors as a group. This broad injunctive relief, which is specifically permitted and so typically granted in a section 304 case, is not unlike the injunction which is automatic in a chapter 7 or 11 case pursuant to section 362 of the Code. *See* 11 U.S.C. § 304(b)(1). Indeed, the reasons underlying an automatic stay were professed to be the reasons supporting injunctive relief in this 304 case. *See* Affidavit of George Weisz, Esq. sworn to April 21, 1988 in support of Order to Show Cause for Section 304 Relief at 4–5.

The purpose of the section 362 stay is to prevent a chaotic and uncontrolled scramble for the debtor's estate, thereby permitting systematic and equitable distribution. H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6296. But just as the automatic stay may apply to situations or actions that bear no relationship to its purpose so that the stay should be modified, terminated, annulled or conditioned for cause, 11 U.S.C. § 362(d)(1), it may be necessary after a 304 case is filed and relief granted to tinker with that relief to do justice in particular circumstances. As my colleague Judge Lifland wrote in *In re Culmer*, 25 B.R. 621, 624 (Bankr.S.D.N.Y. 1982), the court in an ancillary proceeding is free to mold appropriate relief in near blank check fashion.

The legislative history to section 362(d) provides that "a desire to permit an action to proceed to completion in another tribunal may provide ... cause." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 343 (1977), U.S.Code Cong. & Admin.News 1978, p. 6300. Where it is necessary to liquidate a

claim the subject matter of which is within the particular expertise of another tribunal, the bankruptcy courts have deferred to other forums. *See, e.g., MacDonald v. MacDonald (In re MacDonald)*, 755 F.2d 715, 717 (9th Cir.1985) (circuit court affirmed bankruptcy court decision "to avoid incursions into family law matters 'out of consideration of ... economy, judicial restraint and deference to our state court brethren and their established expertise in such matters.'" citations omitted.); *White v. White (In re White)*, 851 F.2d 170, 18 Bankr.Ct. Dec. 60 (6th Cir.1988) (same); *Nathanson v. NLRB*, 344 U.S. 25, 73 S.Ct. 80, 97 L.Ed. 23 (1952) (labor relations); *Holtkamp v. Littlefield (In re Holtkamp)*, 669 F.2d 505 (7th Cir.1982) (personal injury action); *General Drivers, Warehousemen and Helpers Local 89 v. Midwest Emery Freight System, Inc. (In re Midwest Emery Freight System, Inc.)*, 48 B.R. 566, 569 (Bankr.N.D. Ill.1985) (arbitration proceeding).

The IAM contends that the RLA, which governs the IAM Action, provides a unique regulatory scheme applied by courts in such a way as to effectuate it purpose. Banobras contends that the present dispute does not require any special expertise and involves nothing more than ordinary principles of contract law which the Mexican court may apply. In support of this contention, Banobras cites several American cases where the courts have applied the principles of offer and acceptance, intent and meeting of the minds to determine whether a collective bargaining agreement has been formed. The IAM does not dispute that common law contract rules provide some guidance, but asserts that courts have not strictly adhered to the technical rules of contract construction but have interpreted them in such a way as to effectuate federal labor policies.

American labor law is an area which is *sui generis*. In *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578–80, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960), the Supreme Court declared that

[t]he collective bargaining agreement states the rights and duties of the par-

ties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate ... The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or a particular plant ... A collective bargaining agreement is an effort to erect a system of industrial self government. (Citation and footnote omitted.) *See also United Steelworkers v. Am. Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Enter. Wheel and Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Subsequently, in a case involving a labor contract under the RLA, the Supreme Court concluded that based upon its opinion in *Warrior & Gulf,* "[a] collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts." *Transportation–Communication Employees Union v. Union Pacific Railroad Co.,* 385 U.S. 157, 160–61, 87 S.Ct. 369, 371, 17 L.Ed.2d 264 (1966), *reh'g denied,* 385 U.S. 1032, 87 S.Ct. 737, 17 L.Ed.2d 680 (1967) (citations omitted).

Congress fashioned a specialized statutory scheme to effectuate its policy of self-adjustment of the common carrier industry's labor problems. *International Ass'n of Machinists v. St.,* 367 U.S. 740, 759, 81 S.Ct. 1784, 1795, 6 L.Ed.2d 1141 (1961). Concerned with the public's need for safe, reliable and convenient transportation, Congress created a comprehensive procedure for resolution of disputes between labor and management. The basic theory of the RLA is to compel the parties to negotiate their differences in good faith. If they reach an impasse, they must then follow a series of procedures set forth by the RLA. 45 U.S.C. §§ 152, 156. Only after these procedures have been exhausted may the parties abandon the status quo and resort to self-help. *See Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378–80, 89 S.Ct. 1109, 1115–16, 22 L.Ed.2d 344 *reh'g denied,* 394 U.S. 1024, 89 S.Ct. 1622, 22 L.Ed.2d 51 (1969).

Congressional concern with the implementation of labor policies is further exhibited by the treatment accorded collective bargaining agreements in reorganization cases under the Code. In response to the Supreme Court's decision in *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), which allowed a reorganizing debtor to reject unilaterally a collective bargaining agreement on grounds too easily met in the congressional estimation, Congress established a specific procedure to be followed before a debtor may reject a collective bargaining agreement. The debtor must first propose modifications necessary to permit a reorganization, provide information to the union necessary to evaluate the proposal and confer in good faith to reach a satisfactory agreement. If the debtor then seeks to reject, the court can approve a rejection only if a proposal has been made to the union which the union has without good cause refused to accept and if the balance of the equities clearly favors rejection of the agreement. 11 U.S.C. § 1113(c). By way of contrast, a contract to manufacture widgets may be rejected with court approval if the debtor's sound business judgment so dictates. *Bildisco,* 465 U.S. at 523–24, 104 S.Ct. at 1193–94, citing *Group of Institutional Investors v. Chicago, M., St. P. & P.R. Co.,* 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943); 11 U.S.C. § 365(a).

To determine whether a collective bargaining agreement was in existence between the IAM and Aeronaves when the latter filed its petition in bankruptcy, two separate issues will have to be considered: whether a collective bargaining agreement was entered into in March 1987 by virtue of the parties' conduct; and whether the 1983 Agreements terminated prior to Aeronaves' bankruptcy. If resolution of these issues demands a special expertise, it may be appropriate to modify the injunctive relief previously granted.

■ The "rule is well-established that technical rules of contract do not control the question of whether a collective bargaining agreement has been reached."

American Fed'n of Television & Radio Artists, AFL–CIO v. Inner City Broadcasting Corp., 748 F.2d 884, 886–87 (2d Cir.1984); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456–57, 77 S.Ct. 912, 917–18, 1 L.Ed.2d 972 (1957). Although the principles of contract law are applied, they are interpreted liberally and adapted to the collective bargaining context. John Wiley & Sons v. Livingston, 376 U.S. 543, 550, 84 S.Ct. 909, 915, 11 L.Ed.2d 898 (1964); Warehousemen's Union Local No. 206 v. Continental Can Co., Inc., 821 F.2d 1348, 1350 (9th Cir.1987). A labor contract may be binding upon the parties if they have agreed to the substantive terms and conditions, regardless of whether the parties have signed an agreement. NLRB v. New York–Keansburg–Long Branch Bus Co., Inc., 578 F.2d 472, 476–77 (3d Cir.1978); Kaylor v. Crown Zellerbach, Inc., 643 F.2d 1362 (9th Cir.1981); Certified Corp. v. Hawaii Teamsters and Allied Workers, Local 996, IBT, 597 F.2d 1269 (9th Cir.1979).[5] The Second Circuit employs this standard, but will look to see whether the parties intended only a written contract to be enforceable. American Federation, 748 F.2d at 887. The crucial inquiry is not whether a contract was "accepted" in the sense of traditional contract law, but whether the conduct of the parties manifested to a reasonable observer an intention to abide by the terms of an agreement. NLRB v. Haberman Construction Co., 641 F.2d 351, 356 (5th Cir.1981) (en banc); Wilkes Barre Printing Pressmen and Assistants' Union, No. 137 I.P.P. & A.E. v. Great Northern Press, 522 F.Supp. 106, 111 (M.D.Pa.1981). Here, both the IAM and Aeronaves continued to operate pursuant to the terms and conditions of the 1983 and 1987 Agreements for more than a year after alleged entry into the 1987 Amendment. Accordingly, notwithstanding principles of ordinary contract law, a court familiar with the precepts applicable to labor disputes could find that a collective bargaining agreement was formed.

 Federal labor law will also answer the question whether the 1983 Agreements were still valid and binding contracts at the time of bankruptcy. The IAM contends that it served notice on Aeronaves pursuant to section 6 of the RLA prior to March 1986. Section 6 of the RLA makes it incumbent upon a party to a collective bargaining agreement to follow a protracted procedure for resolution of any difference which arises from any proposed changes to the terms of the agreement. Brotherhood of Railway AFL–CIO v. REA Express, Inc., 523 F.2d 164, 168 (2d Cir.1975), cert. denied, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 82 (1976); Manning v. American Airlines, Inc., 329 F.2d 32, 34 (2d Cir.), cert. denied, 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed.2d 29 (1964). Once the section 6 procedures have been exhausted, it is unclear what, if any, provisions of the original agreement survive. The Eighth Circuit has recently addressed this issue and decided that the interpretation of the language in the contract regarding duration (substantially similar to that in the 1983 Agreements) must be viewed in light of the national labor policy enunciated by the RLA. Specifically, that court found that it must construe the contract language so as to further the continuity of existing relationships between management and labor. Thus, the court held that service of a section 6 notice does not wholly terminate the collective bargaining agreement; rather, the subject of the proposed change becomes subject to collective bargaining. Tran World Airlines v. Indep. Fed'n of Flight Attendants, 809 F.2d 483, 485–91 (8th Cir.1987), aff'd, —— U.S. ——, 108 S.Ct. 1101, 99 L.Ed.2d 150 (1988), petition for reh'g pending.

The IAM and Banobras disagree as to the precedential value of TWA. The circuit

---

5. Although these cases were decided under the National Labor Relations Act (NLRA), 29 U.S.C. §§ 141–187, rather than the RLA, the distinction in this context is insignificant, for the construction and interpretation of all collective bargaining agreements are governed by the same standards. 9 W. Jaeger, Williston on Contracts § 1020B (3d ed. 1967). See also Transportation–Communication Employees Union v. Union Pacific Railroad Co., 385 U.S. 157, 161, 87 S.Ct. 369, 371, 17 L.Ed.2d 264 (1966), reh'g denied, 385 U.S. 1032, 87 S.Ct. 737, 17 L.Ed.2d 680 (1967); Hendricks v. Airline Pilots Ass'n, Int', 696 F.2d 673, 677 (9th Cir.1983).

court was affirmed by an equally divided Supreme Court before which a petition for rehearing is pending. And Banobras urges that the decision is at odds with decisions in the Ninth and Second Circuits. *See Airline Pilots Ass'n, Int'l v. Pan American World Airways, Inc.*, 765 F.2d 377, 382 (2d Cir.1985); *International Ass'n of Machinists and Aerospace Workers v. Reeve Aleutian Airways, Inc.*, 469 F.2d 990 (9th Cir.1972), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2273, 36 L.Ed.2d 958 (1973). Any uncertainty in this area of the law is a factor militating in favor of resolution by an American court.

Since both issues fall within the ambit of the RLA and its interstices, they can be more easily resolved by a court whose expertise embraces such matters. Were this a chapter 11 or 7 case, modification of the automatic stay would be appropriate. In fact, withdrawal of this court's reference to determine the claims of employees might well occur. *See* 28 U.S.C. § 157(d). But because this motion was made in the context of a section 304 ancillary proceeding, I must necessarily weigh those factors which led me to grant the injunction in the first instance before I can determine the propriety of modifying the Consent Order to allow the IAM Action to continue.

Section 304 was enacted to provide an alternative to the filing of a full scale bankruptcy case by a foreign debtor who sought to administer assets located in this country and to prevent the dismemberment by local creditors of assets located here. *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 324–25 (1977). The alternative created by Congress is an ancillary proceeding designed to aid in the bankruptcy proceeding pending before a foreign tribunal. When asked to grant relief pursuant to section 304, American courts are to be guided by principles of international comity and respect for the laws of other nations. *Id.* The court must consider the economic and expeditious administration of the estate consistent with six factors including just treatment of all holders of claims against or interests in the estate, comity and the protection of American creditors against prejudice or inconvenience in the proceeding. 11 U.S.C. § 304(c).

Comity is the recognition by one nation of the acts of another as they impact on those within the territory of the former having concern for both international duty and convenience and the rights of those under the protection of its laws. *See Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895). It will not be granted in the bankruptcy context if it would result in forcing American creditors to participate in foreign proceedings in which their claims will be treated in some manner inimical to this country's policy of equality. *See Cunard S.S. Co. v. Salen Reefer Services, A.B.*, 773 F.2d 452, 459–60 (2d Cir.1985).

Mexico's interest in administering Aeronave's estate must be balanced against the interests of the union members in having the IAM Action proceed in the United States. So long as the foreign law is not repugnant to our own, the scale will ordinarily tip in favor of having the foreign tribunal liquidate claims against the estate, because the equitable and orderly distribution of the debtor's property can best be accomplished in a single proceeding. *See Victrix Steamship Co., S.A. v. Salen Dry Cargo, A.B.*, 825 F.2d 709 (2d Cir.1987). Here, however, there is the added wrinkle that, to determine the amount of the union members' claims, the tribunal must first decide whether a collective bargaining agreement existed and what its terms were issues which turn on a specialized area of law laced with strong policy considerations.

Whether there existed a collective bargaining agreement will have to be litigated somewhere. The prejudice to Banobras in litigating in New York is minimized by the presence of local bankruptcy and labor counsel. The claimed prejudice in timing can probably be ameliorated through an application to expedite the proceedings. On the other hand, the United States creditors will be severely prejudiced both if they must litigate individually their claims emanating from a disputed collective agreement in Mexico and if the Mexican bankruptcy court is called upon to construe and apply American labor law in an area in which traditional contract principles are not

strictly applied and in which policy considerations abound. The prejudice to Banobras in litigating the matter here is not nearly so harsh. I conclude that in light of the contest relating to the existence of a collective bargaining agreement, the IAM Action should be tried by a judge fully sensitive to the unique nature and purposes of the RLA, experienced in the complexities of the statutory scheme and familiar with the policies sought to be effectuated by Congress.

█ The district court will first have to determine whether it is empowered to hear the IAM Action, for Aeronaves disputes the court's jurisdiction. Aeronaves alleges that the dispute is a minor, not a major one (which in the absence of the Mexican bankruptcy would be resolved by arbitration if Aeronaves is correct). Assuming that the district court determines that it is vested with jurisdiction and that a collective bargaining agreement exists,[6] it will have to determine what the terms of the agreement are, and will also be in the best position to fix the amount of the claims of the employees which flow from the collective bargaining agreement.[7] If, however, the dispute is minor and the district court concludes that it has no jurisdiction, or, if the district court determines that no collective bargaining agreement exists, then, for reasons of comity, the Mexican bankruptcy court, which maintains control over the disposition of Aeronaves' estate and all the claims against it, should be free to make a determination as to where the claims of the employees are to be liquidated.

SETTLE ORDER in accordance with this opinion.

---

6. Were I convinced that the district court clearly had no jurisdiction I would not modify the injunction. But given that the dispute involves the very existence of a collective bargaining agreement, it is not unlikely that the district court will find that it has jurisdiction. *See Elgin Joliet & Eastern Railway v. Burley,* 325 U.S. 711, 722–28, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945), *aff'd on reh'g,* 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946).

7. This does not mean that it is the province of the district court to determine the allowability of the claims under Mexican law or the priority which they are to be accorded in distribution. These are matters for the Mexican court.