In re Michael D. GERCKE and Mark Homan as Administrators of Dominion International Group, Plc, pursuant to the Insolvency Act of 1986 of the United Kingdom, Debtor.

Bankruptcy No. 90-00337.

United States Bankruptcy Court, District of Columbia.

Jan. 7, 1991.

**622**

Richard L. Epling, William G. Schaefer, Linda A. Mar, Richard D. Bernstein, for petitioners.

Elliot E. Polebaum, William A. Davis, for respondents.

## DECISION

S. MARTIN TEEL, Jr., Bankruptcy Judge.

This is an ancillary proceeding under 11 U.S.C. § 304 brought by Michael D. Gercke and Mark Homan, the administrators of Dominion International Group, Plc, ("Dominion") pursuant to the Insolvency Act of 1986 of the United Kingdom. The administrators seek to enjoin York Associates, Inc., John C. York, Jr., and Michael I. Lipson (collectively referred to as "York") from continuing their civil action currently pending against Dominion in the Superior Court of the District of Columbia.

An evidentiary hearing on the matter was held on July 3, 1990. Both parties are now in agreement that the Court may treat that hearing as a final hearing instead of just a hearing on the question of a preliminary injunction. Pursuant to the following findings of fact and conclusions of law, the Court concludes that, pending a decision in the U.K. insolvency proceeding as to when and where York's claim should be litigated, an injunction ought to be granted enjoining prosecution of the Superior Court action except for enforcement of the Superior Court's order for the production of certain documents.

## BACKGROUND

### I. *The British Insolvency Proceedings*

Dominion is the ultimate parent company of a large and complex group with interests in film finance, Spanish property development, computer peripherals, leasing, car leasing, and financial services. The activities are handled through a network of subsidiaries in various jurisdictions including the United States of America, Guernsey, Bermuda, the Netherlands, Gibraltar, Spain and the United Kingdom. There are over 100 companies in the group altogether. Dominion's management determined in October, 1989, that its existing bank resources were insufficient to enable Dominion to continue to operate. Between October of 1989 and January 18, 1990, efforts were made to secure further financing or to sell the company. When neither option succeeded, Dominion's principal lenders, including the Royal Bank of Scotland, made demands against Dominion under operative financing agreements and guarantees.

On January 22, 1990, the bankers, with the support of Dominion's directors, made

application for an administration order pursuant to Section 8(3)(d) of the United Kingdom's Insolvency Act of 1986. The Companies Court, Chancery Division of the High Court of Justice, granted the application the same day. The United Kingdom insolvency proceedings are denominated *In the Matter of Dominion International Group, Plc.*, 00557 of 1990. Administration was limited to the purpose of Section 8(3)(d) of the United Kingdom Insolvency Act of 1986, namely to allow a more advantageous realization of Dominion's assets than would be achieved by an immediate winding-up (*i.e.*, by immediate liquidation). Administration was not granted under Section 8(3)(a), (b) or (c) of the Act which provides for administration for the purpose of survival of the company and the whole or part of its undertaking as a going concern and certain statutory schemes for compromise or arrangement with creditors.

Immediate liquidation would destroy Dominion's opportunity to effect disposals in the most tax efficient manner. There needs to be a realization of the assets of those companies which would affect the tax status of Dominion before the administrators apply for liquidation in order to minimize taxes. Dominion Financial Services, Plc, which is a subsidiary of Dominion International Finance, a subsidiary of Dominion, is the one company which is significant to realizing the assets in a way which would be more advantageous than a winding-up. Gercke, Dep. I at 60–62. One of the businesses operated by Dominion Financial Services is known as the Film Finances business or FFL. FFL is a profitable operation that all parties expect to yield some recovery for Dominion by reason of inter-company claims. Upon sale of FFL, the administrators will have realized the tax benefits of that business as contemplated by the Administration Order. Efforts to sell FFL, however, have been unsuccessful. No deadline has been set for submission of offers and no contract is presently pending.

While attempting to minimize taxation, the administrators are presently occupied with two other principal functions: collecting Dominion's assets and managing the complex affairs of the estate. Currently available resources of the estate are sufficient to do little more than fulfill these functions.[1]

It is conservatively estimated that prosecution of the Superior Court proceedings would cost the estate $200,000 to $300,000 if a full defense were put forth. The very limited current resources of the estate are inadequate to fund that expense. The administrators could attempt to obtain money from other creditors in order to meet those costs, but the administrators have been unable to obtain assurances that such funding would be made available. To direct limited resources to full-blown litigation in the Superior Court would ultimately risk delaying the conclusion of administration.

Against the disruptive effect that the York litigation might have on the administration of the estate must be balanced the delay the York parties will face if forced to await adjudication of their claims in the British insolvency proceeding. Mr. Gercke's first affidavit (York Exh. 3) explains:

> Once the objective of the Administration Order is achieved and such assets as are available to the creditors have been realised it is inevitable that Dominion will be put into liquidation. I estimate that it is likely to be between two to three years to realise the assets. However a liquidator will be appointed as soon as the purpose for which the Administration Order was made no longer exists. This could take six months to a year. The liquidator will have the role of accepting or rejecting proofs of debt submitted by Dominion's creditors including unliquidated and unsecured claims such as York's. Having paid both the prefer-

---

1. The administrators devote only 15 percent of their time to Dominion matters and the court cannot find that the Superior Court litigation would serve to distract them, in terms of available time as opposed to resources, from their other duties as administrators. Even at the height of their activity, in the first weeks of the administration, the administrators were only spending 33–40% of their time on Dominion matters. Gercke Transcript at Vol. I, 6–7.

ential or priority creditors and the costs of the liquidation, the liquidator will distribute amongst the unsecured creditors in accordance with Section 107 of the Insolvency Act 1986.

I understand that the York proceedings are complex and if pursued are likely to be both lengthy and expensive. There are no assets which would be available to the administrators of Dominion to finance the defence of these proceedings unless other creditors are prepared to provide such finance. I do not believe it fair that creditors should be asked to provide such finance.

Mr. Gercke's estimate that a liquidator could be appointed in six to twelve months is inconsistent with another Dominion representative's estimate that it could take two to three years before realization in underlying subsidiaries could be concluded and a liquidator appointed. Mr. Gercke acknowledged that a liquidator would be appointed, at the earliest, only after a sale of FFL is closed. When that would occur is largely speculative. Moreover, the administrators may pursue actions against certain third and, if they do so, it is expected to delay the discharge of the administrators and the commencement of liquidation. Litigation in the Companies Court of York's claim would not commence until a liquidator is appointed. And once a liquidator is appointed it would take at least one year for York's claim to come to trial. Thus, the expeditious determination of York's claim would not be hampered by allowing York's claim to be litigated in the Superior Court. To the contrary, there is every indication that requiring York to await adjudication of the claim in the Companies Court would substantially delay resolution of York's claim.

## II. *Superior Court Action*

The basis for York's Superior Court action is Dominion's alleged breach of a contract dated July 6, 1989, whereby Dominion agreed to acquire substantially all of the assets of plaintiff York Associates, Inc., in exchange for an initial purchase price of $45,000,000.[2] Dominion consented in that contract to "exclusive jurisdiction and venue of local and federal courts of the District of Columbia," and agreed that the contract would be construed and enforced "in accordance with and governed by the laws of the District of Columbia applicable to agreements made and to be performed wholly within such jurisdiction." Contract § 13.18.

York initiated the civil action against Dominion on August 28, 1989. The parties commenced discovery in the fall of 1989. On December 13, 1989, the Superior Court held a scheduling conference and set March 4, 1991, as the trial date and stayed proceedings through January 30, 1990, Dominion then being engaged in financial negotiations with its creditors. Dominion was unsuccessful in those negotiations and on January 22, 1990 entered into the United Kingdom insolvency proceeding. One week later, on January 29, 1990, Dominion filed a motion to extend the stay pending resolution of Dominion's insolvency proceedings. At a scheduling conference on January 30, 1990, Dominion informed the court of the possibility of seeking protection under the United States bankruptcy laws. The Court extended the stay through the briefing period. On February 12, 1990, York filed its opposition to the stay motion. On March 13, 1990, Dominion replied. On March 14, 1990, a Superior Court judge signed an order denying Dominion's motion to extend the stay. On March 20, 1990, counsel for York wrote to counsel for Dominion proposing an initial, abbreviated document production by Dominion. Dominion's counsel replied the same day stating, "I expect York's pressure to result in Dominion's seeking protection under the U.S. bankruptcy laws," and advising that York's proposal would be considered. On April 13, 1990, York filed a motion to compel production of documents. On April 23, 1990, Dominion responded to the motion to compel. On April 26, 1990, the Superior Court held

---

**2.** Dominion's management did not begin its efforts to secure new financing for its own opera-

tions or to sell Dominion until October, 1989.

an initial scheduling conference and a hearing on the motion to compel. Those proceedings were not recorded. The Superior Court judge made an oral ruling at the April 26 hearing requiring production of documents and a written order dated April 26, 1990, specifying the time for production was received by Dominion's counsel on April 30, 1990. The order required Dominion to produce the three categories of documents described in York's counsel's letter of March 20, 1990. Those categories are:

1. Memoranda and reports written by Carl Openshaw since July 5, 1989, concerning Dominion's financial condition;

2. Reports prepared by outside auditors since July 5, 1989 concerning Dominion's financial condition; and

3. Documents prepared since July 5, 1989 related to Dominion's attempts to sell FFL.

Dominion informed the Superior Court judge at the April 26, 1990, hearing that a filing under 11 U.S.C. § 304 would be made that day and the § 304 petition was in fact filed on April 26, 1990. Dominion seeks to restrain the effects of the Superior Court's order and proceedings in the Superior Court generally.

## DISCUSSION

### I

■ York contends first that it would be inequitable to permit Dominion to obtain a stay of the Superior Court proceeding after Dominion already applied for and was denied a stay in the Superior Court. York characterizes Dominion's efforts here as seeking a second bite of the apple. York's argument is not founded on collateral estoppel but on inherent equitable principles. It draws upon the case of *Rosenthal v. Coates*, 148 U.S. 142, 13 S.Ct. 576, 37 L.Ed. 399 (1893), in which the Supreme Court held that Federal removal laws "do not contemplate that a party may experiment on his case in the state court, and, upon an adverse decision, then transfer it to the Federal court." *Id.* at 145, 13 S.Ct. at 576. York emphasizes that more than one month before filing its § 304 petition, Dominion had a § 304 filing in view but nonetheless

elected to fight York's discovery motion in the Superior Court, which it did and lost.

Although these circumstances may be pertinent to the questions of prejudice to York under 11 U.S.C. § 304(c)(2) and comity under 11 U.S.C. § 304(c)(5), they do not preclude Dominion's seeking relief under 11 U.S.C. § 304. First, there is no order of the Superior Court in the record reflecting the basis upon which the Superior Court resolved the motion for stay. The Superior Court may very well have felt that it was best to leave any of Dominion's comity arguments to resolution in the Bankruptcy Court, as part of a § 304 determination, in the event that Dominion truly felt that a continuation of the Superior Court action would imperil Dominion's estate. Had the Superior Court fully tried the matter and issued an opinion determining that comity did not require a stay, this court would be presented with a wholly different question, that of collateral estoppel. Second, 11 U.S.C. § 304 is not the equivalent of removal under 28 U.S.C. § 1441: this is an independent proceeding, ancillary to Dominion's insolvency proceeding in the United Kingdom, to enjoin the Superior Court action. The court does not step into the shoes of the Superior Court as would occur in a removal case. The history of the Superior Court case is only relevant insofar as it impacts on the criteria of 11 U.S.C. § 304. Those criteria are sufficiently flexible to guard against inequitable conduct.

### II

■ York argues unpersuasively that the focus of 11 U.S.C. § 304 is with actions against a debtor's assets in the United States, not with an action by an unsecured creditor simply to reduce a claim to judgment. Section 304(b)(1)(A)(i) authorizes the court to enjoin an action against a debtor with respect to property involved in a foreign insolvency proceeding. York contends that this does not cover an action simply to reduce a claim to judgment. York has disavowed any attempt to seize assets of Dominion in the United States. However, fixing the amount of York's claim in the Superior Court would affect the amount of

the claim allowable against the property involved in the United Kingdom insolvency proceeding and thus the Superior Court action arguably is one with respect to the property of the estate. Even accepting York's analysis of § 304(b)(1)(A)(i), another provision, § 304(b)(3), authorizes the court to "order other appropriate relief." In considering the criteria of § 304(c) for granting relief, it is obvious that there may be cases in which it is appropriate to enjoin a mere action to reduce a claim to judgment in order to "assure an economical and expeditious administration of [t]he estate." *See, e.g., In re Banco Nacional de Obras y Servicios Publicos, S.N.C.,* 91 B.R. 661, 668 (Bankr.S.D.N.Y.1988) (concluding that absent a federal labor law issue, the Mexican bankruptcy court should be free to determine where employees' claims are to be liquidated).

### III

Injunctive relief requires as a predicate a showing of "irreparable harm and inadequacy of legal remedies." *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974). York argues that no irreparable injury will result if Dominion is required to produce a limited amount of documents in the Superior Court action or if that action is allowed to proceed.

### A.

■ The Superior Court action is one to recover a claim of $30 million. Based on conversations with counsel, the administrators estimate that defense of that action through trial would cost, at a minimum, $200,000 to $300,000. Litigation expenses by themselves do not justify a stay of a proceeding. Where, however, there is a showing that the incurring of the litigation expenses threatens the assets of a bankrupt estate as opposed to merely diminishing them, the injunction may be appropriate. *NLRB v. Superior Forwarding, Inc.,* 762 F.2d 695 (8th Cir.1985). York contends

that Dominion could borrow the amounts necessary to litigation but produced no evidence that administrators would be able to secure borrowing for this purpose. Although this court is somewhat skeptical that Dominion could not raise the necessary funds if push came to shove, the only evidence is that inquiries into securing such financing have met with no assurances. If the Superior Court action did go forward, and financing proved unavailable, it might force the administrators to default rather than litigate. That would constitute irreparable harm to the estate.[3] If, on the other hand, the administrators spent every available realization on hand and to come on hand in the near future (aside from a major realization), expenditure of those funds would constitute a diversion of funds needed for the purpose of maximizing value. That, too would constitute irreparable harm. *NLRB v. Superior Forwarding, Inc.,* 762 F.2d at 699; *In re Hunt,* 93 B.R. 484, 495–6 (Bankr.E.D.Tex.1988).

Harm to the estate also exists in the form of disruption of an orderly determination of claims and the fair distribution of assets in a single case. *See Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709 (2d Cir.1987). First, although the actual value of Dominion's estate was expressly made not an issue, there is obvious uncertainty as to the ultimate value of Dominion's estate. York's own expert conceded that a liquidator's decision whether to compromise York's claim could be affected by the size of the pie of assets that ultimately is available for distribution.

Second, if this court were to retain jurisdiction to allow York to make a showing at a later date that Dominion has garnered sufficient funds to afford to litigate, this would impose on Dominion the added cost of litigating here the questions of the availability of funds and the most efficient and economical manner of determining York's claim when the Companies Court will likely already have great familiarity with those questions as the court presiding over the

---

**3.** Although there was a stipulation that the value of the estate could not be placed in issue, counsel for York conceded at the hearing on discovery that claims of creditors in Dominion's

case would not be paid in full. The harm to the estate would thus fall on Dominion's other creditors.

entirety of Dominion's affairs. When the Companies Court decides *when* litigation of York's claim ought to go forward, it also will be in the best position to determine *where* the litigation ought to go forward, a question whose answer may well be altered with the passage of time.

This is not a case where litigation in the Superior Court would be far and away more cost effective. The Superior Court action has only proceeded through the pleading stage and partial litigation over production of documents. If York were forced to litigate in the Companies Court instead of the Superior Court, the estate would incur comparable attorneys fees. David D.T. Harrel, an experienced English solicitor, testified in his deposition that the attorneys fees in the U.K. would be comparable to, and perhaps more than, attorneys fees in the U.S. on the basis that the Companies Court would in all likelihood require the parties to submit pleadings, engage in document discovery, prepare oral and written court submissions (with applications for further and better discovery possible) and go to trial, which would require the services not only of a U.K. firm of solicitors (whose costs are comparable to those of large U.S. firms) but also of a barrister to present the case in court. On this record, the present balance tilts in favor of the Superior Court as the better forum for economical and efficient litigation if litigation were not now stayed. But when the decision is made by the Companies Court that litigation ought to proceed, answering the questions of cost and efficiency will require delving into the then current location of witnesses and documents, any narrowing of the issues reached in the interim by the parties, and the availability of trial dates in the two forums. *See In re Axona Intern. Credit & Commerce Ltd.,* 88 B.R. 597 (Bankr.S.D.N.Y.1988), *aff'd,* 115 B.R. 442 (S.D.N.Y.1990). The Companies Court

will be in the best position readily to address those issues. This is not a case like *Banco Nacional,* 91 B.R. at 668, where clearly reasons will exist that will make the Superior Court the better forum for resolving York's claim.

### B.

■ In contrast to the question of whether to allow full-blown litigation to continue is the question of whether the Superior Court's order to produce documents should be enjoined. The probable location of documents responsive to the Superior Court's production order has been narrowed by production of an index of documents pursuant to the discovery that took place on the § 304 petition. Although other files may contain responsive documents, the materials most likely responsive to the order are (1) a limited number of sub-files specifically labelled "FFL," (2) a limited number of files listed as containing Mr. Openshaw's files, and (3) two financial reports (in addition to Price Waterhouse's reports of October 1989 and March 1990) prepared at the end of 1989. There will be no risk of irreparable harm if Dominion's administrators are required to pull these limited files to ascertain whether they are responsive to the production order and whether any of the documents are privileged. Verifying that other files are or are not unresponsive should entail little expense.[4] Dominion's administrators themselves ought to be prudently investigating York's $30 million claim early on—by pulling together readily locatable documents—to determine whether steps should be taken now to protect the estate (e.g., by way of keeping track of the location of witnesses) before full-blown litigation ensues. Although some attorneys fees will be incurred in evaluating the documents and in litigating any privilege questions, there has

---

**4.** Dominion complains that there are some 270 boxes of Dominion files and that a thorough inspection of each box could take hundreds of hours. Mr. Gercke estimated that such a search could cost the estate between $8,000 and $10,000. Gercke's Second Affidavit at par. 7. But some judgment has to be exercised in any document search. Files likely to contain respon-

sive documents have, as previously indicated, already been identified. Dominion should be able to verify with little effort which boxes contain documents of a nature unresponsive to the Superior Court order. Dominion, in any event, has failed to show that the expense of completing a document search is significant enough to constitute irreparable harm.

been no showing that those fees will be substantial enough to threaten the administrators' other current administrative tasks. Such fees will fall far short of the fees that full-blown litigation would entail, and Dominion simply has not shown that incurring such limited fees will cause irreparable harm.

Dominion argues that document production efforts may result in a duplication of efforts on behalf of the estate and that it is inherently undesirable for discovery to proceed outside the bankruptcy forum responsible for administering the estate in a coordinated fashion. That contention must be rejected as only speculative and unsupported by any concrete evidence of an actual ongoing use of the documents that would be impeded by production in the Superior Court.

Dominion contends that any injunctive relief ought to be as to the Superior Court action as a whole and that a piecemeal approach to the question is inappropriate because "every litigant would be able to press its case up to the very breaking point of irreparable harm." The court rejects this contention. All that is at issue is whether the Superior Court's production order, resulting from litigation in the Superior Court well after Dominion's bankruptcy proceeding began, ought to be stayed. Dominion allowed decision of the issue before filing its petition under 11 U.S.C. § 304. It is hardly in a position to claim that it is inappropriate to review whether York ought to have the fruits of this completed step of litigation. Although the production order is incident to the Superior Court civil action, it can be viewed as akin to a severable order imposing distinct obligations on Dominion. York ought to be allowed to obtain enforcement of that order now. The parties have already engaged in extensive discovery concerning harm to the estate, and there is no reason to believe the Companies Court itself would not order the

limited production this court envisions if York were required to seek authorization there. But this court will not require York to litigate the question of harm anew in the Companies Court when it has already been extensively litigated here.[5]

### C.

Dominion has not argued that absent irreparable harm injunctive relief is nevertheless appropriate. Section 304 does not itself speak in terms of irreparable injury. Arguably, comity—including considerations of harm to the upholding of international duty and convenience—might dictate injunctive relief without a showing of irreparable injury to Dominion. But as the analysis below shows, comity and other factors under 11 U.S.C. § 304(b) do not warrant any alteration of the foregoing conclusions based on an irreparable injury analysis.

### IV

*The Criteria of § 304 Warrant a Limited Injunction*

■ The criteria for relief under 11 U.S.C. § 304(b) are set forth in 11 U.S.C. § 304(c):

> In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of [the] estate, consistent with—
>
> (1) just treatment of all holders of claims against or interests in such estate;
>
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (3) prevention of preferential or fraudulent dispositions of property of such estate;

---

5. The facts that would be pertinent to consideration by the Companies Court on an application for relief from the stay of the Superior Court production order are already in focus here. The expense York would incur in presenting those facts twice—once here and then in the

Companies Court—weighs heavily in this court's conclusion that this court has an obligation to sort through the harm to the estate instead of merely leaving the question to the Companies Court.

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 304(c).

With respect to the overall factor, "the economical and expeditious administration of [the] estate," the question of *economical* administration of the estate is answered by the analysis of irreparable harm. *See* part III above. The question of *expeditious* administration of the estate, York argues, entails an analysis of which forum can more quickly adjudicate York's claim. Certainly this is not a case of an unduly slow United States forum impeding a foreign bankruptcy forum in rapidly concluding administration of the estate. But the question of expeditious administration is not answered solely by what forum can try the controversy first. Diversion of limited resources to the Superior Court litigation could divert funds necessary for the administrators' completing their tasks and ultimately delay the start of winding-up procedures. On balance, aside from the question of production of a limited number of files for which the balance tips the other way, the economical and expeditious administration of the estate justifies an injunction. To determine the extent of relief to which Dominion is entitled, the court must examine what relief would be consistent with the six above enumerated criteria.

(1) *Just Treatment of All Holders of Claims Against or Interests in the Estate*

Enjoining full-blown litigation in the Superior Court is consistent with the just treatment of all holders of claims against or interests in the estate. The procedures of the United Kingdom Insolvency Act are comparable to the procedures of our Bankruptcy Code. Once the winding-up process begins any creditor, including York, may submit a claim and, if it is disallowed, may submit it to the Companies Court for adjudication. Moreover, creditors, including York, may seek to have the Companies Court lift the automatic stay under § 11(3)(d) of the Insolvency Act to pursue litigation elsewhere. The discretion afforded under § 11(3)(d) is similar to that exercised under 11 U.S.C. § 362(d). The Companies Court is in the best position to determine when and where claims may best be adjudicated. *See In re McLean Industries*, Case Nos. 86–B–12238 through 86–B–12241 (Bankr.S.D.N.Y. Order Modifying Automatic Stay filed February 23, 1987) (English creditors of U.S. corporation in bankruptcy permitted to adjudicate claims in United Kingdom courts). To allow York's claim to be tried in the United States *now* would threaten the just treatment of all holders of claims because the estate has inadequate resources to engage in a trial without threatening the administrators' efforts to maximize the estate. Permitting production of limited files, however, ought not be prejudicial to those goals.

(2) *Protection of York Against Prejudice and Inconvenience in Processing of Claim in Companies Court*

The most that York can assert on the question of prejudice is that litigation in the Companies Court (1) will be delayed, (2) will cost as much, if not more, than litigation in the Superior Court and (3) will deprive York of the benefits of the forum selection clause under the contract with Dominion. York does not dispute the fairness of the United Kingdom insolvency system. York's claim is a basic common law claim that the Companies Court is fully capable of adjudicating. The prejudice and inconvenience of which York complains are typical of the prejudice and inconvenience that a United States creditor might encounter in being forced to litigate a claim in a United States bankruptcy case. It is doubtful that under § 304 Congress expected a foreign bankruptcy proceeding to be less prejudicial and inconvenient than a United States bankruptcy case before injunctive relief would be granted.

First, with respect to the question of delay, the bankruptcy process almost inevitably entails some delay during which a

beleaguered debtor's affairs are sorted out before claims litigation commences. While there is always some risk of prejudice in such delay, there is no suggestion here that substantial risk of lost evidence exists. York does not allege that any witnesses are advanced in age or that documentary evidence in the hands of third parties may become unavailable. With the passage of time, memories may fade. The Companies Court could be expected to hear the dispute in less than two years if Mr. Gercke's estimate is accurate and, the evidence suggests, no later than in the next three to four years. If Mr. Gercke's estimate is unrealistic and the administration threatens to be unduly prolonged, particularly if beyond a stage at which Dominion finally has sufficient resources to litigate, the Companies Court can then readily assess the prejudice to York in determining whether relief from the automatic stay is appropriate.

Second, with respect to the question of cost, it is difficult to make an accurate comparison of the expense of litigating later in the Companies Court versus litigating in the Superior Court in March 1991. All that York's own expert could say was that it would cost as much, and perhaps more, to litigate later and that some costs already incurred by York in the Superior Court might have to be incurred anew. But the magnitude of the latter category of costs is unclear because some of the benefits of work already done would not be lost. The court is allowing the production order to be enforced, and other pleadings and filings could plainly be reshaped for filing in the Companies Court without great cost in comparison to the cost of original preparation.

Third, with respect to the question of the loss of the forum selection clause, it would be prejudicial to York to be deprived of the benefits of that clause because of the delay and cost factors already mentioned. If any portion of the trial is held in the Companies Court, the York parties may be required to travel to London to participate and, if that happens, they will have to introduce British counsel to a case with which American counsel are already familiar. But those concerns are principally questions of cost, and York has not shown severe prejudice on the question of overall cost.

With respect to the question of document production, York would suffer the prejudice of having fully litigated that issue in the Superior Court and having to brief it anew in the Companies Court. In addition, a delay of document production could prejudice York in its efforts to prepare for possible trial. The documents may reveal areas of inquiry and trial preparation that York could profitably pursue but might otherwise overlook while the litigation is on hold. The prejudice to Dominion is minimal because Mr. Gercke has already been able to identify the files likely to be responsive to the production order.

### (3) *Prevention of Preferential Dispositions of Property of the Estate*

■ Dominion argues that allowing the Superior Court litigation to go forward could result in preferential treatment of York because Dominion might be forced to default thus giving York a greater claim than that to which it is entitled. That argument, however, has already been addressed under point (1) above, concerning the just treatment of all holders of claims. The concern of § 304(c)(3) is with dispositions of property of the estate outside of the bankruptcy proceeding, not with the question addressed by § 304(c)(1) of just treatment of all holders of claims in the resolution of claims. Allowing or not allowing the Superior Court action to go forward would have no impact on the prevention of preferential transfers of property of the estate. *But see In re Banco de Descuento,* 78 B.R. 337, 340 (Bankr.S.D.Fla. 1987) (overly generous settlement of dispute with other creditors would be viewed as preference).

### (4) *Distribution of Proceeds of the Estate in Accordance with the Order Prescribed by the Bankruptcy Code*

Both parties concede that the United Kingdom Insolvency Act is substantially in

accord with the Bankruptcy Code on the order of distribution of proceeds.

### (5) Comity

A survey of pertinent caselaw demonstrates that York's comity arguments—save as to the enforcement of the Superior Court's production order—must be rejected. As observed in an oft-quoted statement in *Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895):

> "Comity," in the legal sense, is neither a matter of absolute obligation on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

For obvious reasons, *see Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C.Cir.1984), Federal courts generally accord comity to a foreign court when the court is of competent jurisdiction and according comity does not prejudice the rights of United States citizens or violate domestic foreign policy. *See Hilton*, 159 U.S. at 202–03, 16 S.Ct. at 158; *Cunard S.S. Co. v. Salen Reefer Services A.B.*, 773 F.2d 452, 458 (2nd Cir.1985). However, "the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act." *Laker Airways*, 731 F.2d at 937 n. 104. *See Overseas Inns S.A., P.A. v. United States*, 911 F.2d 1146 (5th Cir.1990) (comity not accorded to Luxembourg bankruptcy plan of reorganization that treated IRS as general, rather than priority, creditor in contravention of United States policy of according taxes priority). Generally, however, the courts have accorded comity to foreign bankruptcy proceedings.

In *Cunard* the court explained:

> The granting of comity to a foreign bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion. Consequently, American courts have consistently recognized the interest of foreign courts in liquidating or winding-up the affairs of their own domestic business entities.

*Cunard*, 773 F.2d at 458. In *Canada Southern R. Co. v. Gebhard*, 109 U.S. 527, 537, 3 S.Ct. 363, 370, 27 L.Ed. 1020 (1883), the Court held U.S. bondholders bound by a plan of reorganization approved in Canadian proceedings, reasoning:

> [E]very person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes. To all intents and purposes, *he submits his contract with the corporation to such a policy of the foreign government,* and whatever is done by that government in furtherance of that policy, which binds those in like situation with himself, who are subjects of the government, in respect of the operation and effect of their contracts with the corporation, will necessarily bind him.

*Id.* (emphasis added). This means "that creditors of an insolvent foreign corporation may be required to assert their claims against a foreign bankrupt before a duly convened foreign bankruptcy tribunal." *Cunard*, 773 F.2d at 458–59. In *Cunard* the creditor argued that extending comity would violate the public policy in favor of arbitration of disputes. The contract between the creditor and Salen Reefer, a Swedish Company in bankruptcy in Sweden, specifically provided for arbitration in London of any dispute arising under the contract. The court nevertheless upheld a stay of an attachment in aid of any eventual arbitration award, thus presumably forcing *Cunard* to present a claim and risk its adjudication in the Swedish bankruptcy proceedings. In so doing, the court weighed "the strong public policy in favor of arbitration" against "the public interest in the fair and efficient distribution of as-

sets in bankruptcy." *Id.* at 459.[6] In *Cornfeld v. Investors Overseas Services, Ltd.,* 471 F.Supp. 1255 (S.D.N.Y.), *aff'd,* 614 F.2d 1286 (2d Cir.1979), Cornfeld sued the defendant ("IOS") to reduce a contract claim to judgment and attach assets. IOS was in Canadian insolvency proceedings. Cornfeld relied on a contract clause providing that his claim was to be decided under New York law in arguing that New York was the appropriate forum for litigating the claim. The court held that this did not preclude resolution of the claim in Canada and found that "any inconvenience to New York witnesses would be outweighed ... by the factors in favor of having all of the claims against [the debtor] resolved in a single proceeding in the country where [the debtor] was incorporated." *Id.* at 1262.

York argues first that the Dominion–York contract included a clause making the courts of the District of Columbia the exclusive forum for adjudicating disputes under the contract and that allowing the Companies Court to adjudicate York's claim would be prejudicial to York and, under *Hilton v. Guyot,* comity ought not be accorded because of this prejudice. But the intervention of insolvency proceedings requires the mandatory venue clause to yield to considerations of comity and the interests of all creditors of Dominion's estate in an equality of distribution. *See Kenner Products Co. v. Societe Fonciere et Financiere Agache–Willot,* 532 F.Supp. 478, 479–80 (S.D.N.Y.1982) (clause consenting to jurisdiction of New York courts). *See also Cunard S.S. Co.,* 773 F.2d at 458; *Banco de Descuento,* 78 B.R. at 339. Because of Dominion's current limited resources, the Companies Court ought to make the decision when and where the claim will be adjudicated and can give weight to the desirability of respecting the mandatory venue clause of the Dominion–York contract in weighing all factors. While the Dominion–York contract's venue clause

was a mandatory clause, such that Dominion waived any right to litigate elsewhere than in the District of Columbia, upon the filing of insolvency proceedings, the interests of other creditors intervened. *See Victrix,* 825 F.2d at 714 (distinguishing debtor's purely private rights versus a case taking on a "public character by virtue of [the debtor's] insolvency and the institution of the ... bankruptcy proceeding"). Concededly, the mandatory venue clause distinguishes this case from *Kenner Products.* Thus, there are sound arguments why the Superior Court litigation ought to go forward in order to assure the integrity of mandatory choice of venue selection clauses. *See* Morales and Deutsch, *Bankruptcy Code Section 304 and U.S. Recognition of Foreign Bankruptcies: The Tyranny of Comity,* 39 Bus.Lawyer 1573, 1583, 1596–97. But those considerations do not outweigh the necessity to permit the Companies Court to regulate when and where claims against Dominion can be adjudicated.

The Dominion–York contract additionally provided for any dispute to be governed by the laws of the District of Columbia. As in *In re Lines,* 81 B.R. 267, 273 (Bankr.S.D.N.Y.1988), there is no evidence that the Companies Court would fail to interpret the contract under District of Columbia law in the event of a question as to its meaning and no such question has been identified. *See also Cornfeld,* 471 F.Supp. at 1262 (expressing no concern over a Canadian bankruptcy tribunal's deciding a claim even if required to be decided under New York law). If such a question is identified upon which the District of Columbia Court of Appeals has not yet spoken, the Companies Court has discretion to take that into account as a factor that would weigh in favor of the litigation proceeding in the District of Columbia court system to permit a definitive answer by the District of Columbia

---

**6.** In a related case, *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709 (2d Cir.1987), the court deferred to the Swedish bankruptcy proceedings with respect to the question of enforceability of an arbitration award already obtained. Both *Cunard* and *Victrix* are, however, of limited relevance to whether mere litigation to determine the amount of a claim ought to be enjoined because the act being enjoined in those cases was not the litigation of claims—that was occurring or had occurred in London—but attachments of assets, acts clearly threatening the policy of equality of treatment of creditors.

Court of Appeals. *Cf. Banco Nacional,* 91 B.R. at 668.

Finally, York urges that comity ought not be accorded the U.K. insolvency proceedings because the U.K. would not reciprocate were the shoe on the other foot. In other words, claims York, "comity has to be a two-way street," quoting *Remington Rand Corp. v. Business Systems, Inc.,* 830 F.2d 1260, 1273 (3d Cir.1987). "Although reciprocity is no longer an absolute condition prevalent to comity, ... it is always a permissible consideration...." *Id. See also Laker Airways,* 731 F.2d at 939. In this circuit, "the courts should refrain from creating or resurrecting a reciprocity doctrine," making reciprocity a prerequisite to according comity to foreign acts. *Tahan v. Hodgson,* 662 F.2d 862 (D.C.Cir.1981). Both *Remington Rand* and *Laker Airways* essentially presented the question of whether comity ought to be accorded to foreign proceedings in the absence of assurances that the ongoing related United States proceedings would be accorded comity. That issue is not presented here. Rather, this case is more analogous to *Cunard* where the parties' proofs did not establish conclusively whether in an equivalent situation reciprocity would be granted in Sweden to a U.S. bankruptcy proceeding. The district court in *Cunard* did not decide the question of reciprocity "because it found reciprocity not to be determinative." *Cunard,* 773 F.2d at 460. In determining that the district court did not abuse its discretion, the court of appeals stated that "while reciprocity may in some circumstances be considered a relevant factor, proof of reciprocity is not essential for the granting of comity." *Id.*

Here the evidence is less than conclusive that a U.K. court would refuse to accord comity to U.S. bankruptcy proceedings in equivalent circumstances. York relies on *Flexistowe Dock & Railway Co. v. U.S. Lines, Inc.,* 2 LLR 76 (Queen's Bench Division, Commercial Court, 1987). There the court continued in force so-called *Mareva* injunctions in favor of English creditors against funds of an American company in a case under Chapter 11 of the Bankruptcy Code. The funds were to remain frozen subject to the right of the debtor to apply for a U.K. "winding-up order" (liquidation proceedings) to assure equality of distribution among creditors. The decision was premised in part on an uncontested finding "that some of the U.S. creditors will be paid off at least in part in order to induce them to carry on doing business with [the debtor] during the reconstruction period." 2 LLR at 93. For this and similar other reasons [7] the court viewed the use of the English funds in the U.S. bankruptcy proceedings as prejudicial to the interests of the English creditors and noted that the debtor's arguments in favor of release of the funds would have substantial force if the debtor were merely engaged in ordinary liquidation proceedings. Whatever might be said about the parochial nature of the *Flexistowe* decision,[8] it is no proof that in equivalent circumstances to those of this case, a U.K. trial court would refuse to accord comity to U.S. insolvency proceedings having an ultimate goal of liquidation. York's reciprocity argument must be rejected.

As to the Superior Court's production order, in contrast, considerations of comity dictate that York be allowed to seek enforcement of that order as discussed with respect to the question of irreparable injury. After Dominion's bankruptcy pro-

7. Because the debtor proposed to reorganize as a company with operations limited to North America, the *Flexistowe* court also viewed any reorganization as a going concern as of benefit to the debtor and also to its North American creditors "who may well both be able to recover their debts or at least a substantial dividend thereon and also, if the scheme succeeds, continue their commercial relationship with [the debtor] as hitherto" 2 LLR at 93. The English creditors with English-based operations in contrast, the court found, could see no possible benefit to them in the *Mareva* funds being used by the debtor in its reorganization efforts. *Id.*

8. The decision is unfortunate because it fails to recognize that the release of funds would serve to maximize the total recovery by all creditors through preservation of going concern value and elevates the parochial interests of the English creditors over the interests of the general creditor body.

ceedings had begun, it deliberately delayed filing a petition under 11 U.S.C. § 304 until after it had litigated the question of production of documents in the Superior Court and obtained an adverse answer. A foreign debtor ought not be allowed to toy with the American state-federal system of courts by first seeking a favorable ruling in a state court and, only upon losing that effort, then turning to the federal bankruptcy court to enjoin the state court ruling. That conduct is inequitable and prejudicial to the administration of justice and ought not be tolerated. *Cf. Rosenthal v. Coates,* 148 U.S. at 145, 13 S.Ct. at 576; *Precision Instrument Mfg. Co. v. Automotive M.M. Co.,* 324 U.S. 806, 815, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945) (doctrine of unclean hands applies to any willful act concerning the cause of action that transgresses equitable standards of conduct). Because the conduct is fundamentally at odds with the strong public policy of the United States, it provides a basis for not according comity. *Laker Airways,* 731 F.2d at 937; *Overseas Inns,* 911 F.2d at 1149. The administrators displayed on behalf of the foreign bankruptcy proceeding the type of callous disregard to the U.S. court system that simply cannot be disregarded. *Cf. Laker Airways,* 731 F.2d at 939. This is particularly the case when there has been no showing that the administration of the U.K. insolvency proceedings will be irreparably harmed by permitting enforcement of the Superior Court's production order. Citing *Victrix,* 825 F.2d at 713–14, Dominion argues that it ought not be denied relief based on conduct in an earlier court proceeding because such denial will primarily injure creditors, not parties to the earlier proceeding, who have sought relief only in Dominion's bankruptcy case. But *Victrix* concerned the question whether to stay an attachment pursuant to an earlier arbitration award and judgment. York has disclaimed any intention to seize Dominion assets.

### (6) *Fresh Start Criterion*

The sixth criterion of § 304(c) applies only in the case of an individual and is inapplicable here.

On balance, the application of § 304 warrants an injunction as to the Superior Court litigation except for the enforcement of the production order.

### CONCLUSION

Based on the foregoing an order will be entered enjoining further litigation in the Superior Court except to the extent of enforcing the production order, including granting of any appropriate sanctions in the event of a failure to comply.