AMERICAN FEDERATION OF TELEVISION & RADIO ARTISTS, AFL–CIO, NEW YORK, Plaintiff-Appellant,

v.

INNER CITY BROADCASTING CORPORATION, Defendant-Appellee.

No. 88, Docket 84–7364.

United States Court of Appeals, Second Circuit.

Argued Sept. 21, 1984.

Decided Nov. 21, 1984.

Robert A. Cantore, New York City (Daniel Engelstein, Vladeck, Waldman, Elias & Engelhard, New York City, of counsel), for plaintiff-appellant.

John L. Edmonds, New York City, for defendant-appellee.

Before OAKES, WINTER and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Plaintiff American Federation of Television and Radio Artists (AFTRA) appeals from the denial of its petition to compel defendant Inner City Broadcasting Corporation to arbitrate a dispute alleged to have arisen under two collective bargaining agreements between the parties. AFTRA also appeals from the denial of its motion for a preliminary injunction directing Inner City to implement a 6.5% wage increase pending arbitration.

In the proceedings below, AFTRA alleged that on September 9, 1983, AFTRA and Inner City had orally entered into collective bargaining agreements that con-

tained the requisite arbitration clauses and the wage increases AFTRA now seeks to enforce. Inner City denied that these agreements were made.

Judge Lowe denied the motion for a preliminary injunction on the ground that AFTRA had not demonstrated irreparable harm, and, finding no merit in AFTRA's arguments to the contrary, we affirm the denial without further discussion.

After a hearing, Judge Lowe also determined that no contract existed between the parties, and she therefore denied the request for arbitration. On this issue we reverse and remand for further proceedings consistent with this opinion.

## BACKGROUND

As the collective bargaining representative for certain employees of two radio stations owned by Inner City, AFTRA entered into collective bargaining agreements with Inner City in February 1980. When the agreements expired on February 15, 1983, negotiations for successor agreements commenced.

At the September 9, 1983 bargaining session, the chief negotiators for AFTRA were Randolph Paul and Kim Roberts. Inner City's chief negotiator was its vice president and general manager, Charles Warfield. Union members, including Judy Simmons, were also present. The meeting began at 2:00 p.m. "on the record" when Paul presented AFTRA's proposal for salary increases over the next three years. Warfield rejected AFTRA's proposal and instead offered a smaller, 6.5% increase each year for the next three years.

The parties disagree on the exact nature of Warfield's counteroffer, particularly as to whether, how, and when it had to be accepted. Relying on Warfield's testimony, Inner City claims that Warfield conditioned the counteroffer on acceptance by 5:00 p.m. that day; if not accepted, it would be automatically withdrawn. Relying on Roberts' and Paul's testimony, AFTRA contends that Warfield's counteroffer was an impasse proposal which Inner City would implement at 5:00 p.m. whether AFTRA accepted it by then or not. The parties also disagree on other terms of Warfield's counteroffer.

After Warfield made the counteroffer, whatever its exact terms, the meeting went "off the record". Although there is some dispute as to when the meeting broke up, all agree that it stopped at the earliest at 4:45 p.m. In any event, Roberts, Paul, and Simmons testified that when the meeting did break up, they and other union employees moved across the hallway to Simmons' office cubicle to celebrate a successful end of negotiations. At approximately 7:00 p.m., Warfield stopped by Simmons' cubicle. He testified that he "stuck his head in the door" for five or ten minutes and left. Union witnesses testified that his behavior while there suggested that he was joining in the celebration of a successful end of negotiations. In addition, Paul testified that he spoke to Warfield alone shortly after the negotiating session ended and indicated that the counteroffer had to be ratified by the employees and by both the local and national boards of AFTRA. Warfield denied that this conversation took place.

Paul testified that Warfield's September 9 counteroffer was then orally presented to, and ratified by, the membership on September 28, 1983, and later ratified by the local and national boards of AFTRA. The parties agree that in early October Paul called Warfield, informed him of the ratification, and asked whether Paul or Warfield should draft the written contract. But while Paul testified that Warfield told him to draft the contract, Warfield testified that he informed Paul that there was no contract, but to draft something and send it over if he wanted Warfield to look at it.

On October 28 Paul sent written drafts of the contract to Warfield, who replied by letter on November 3, 1983 that Paul had failed to understand that the counter offer had expired at 5:00 p.m. on September 9. Paul responded by letter on November 10 stating that provisions of the agreement relating to minimum salary and pension

had become effective on September 9, 1983, and outlining when other terms of the agreement became effective. Although labor and management conducted further meetings in January and February 1984, they were unable to reach common ground. AFTRA then filed this suit under § 301(a) of the Labor Management Relations Act. 29 U.S.C. § 185(a).

After denying AFTRA's motion for a preliminary injunction, the district court ordered an evidentiary hearing to determine whether the parties had reached an agreement, and thus, whether an enforceable contract existed. Roberts, Paul, Simmons, and Warfield testified as indicated above. Further, Roberts and Paul admitted that they had never expressly accepted the management counteroffer on September 9. They contended, however, that their behavior at the celebration, Warfield's participation in the celebration, and Paul's statement to Warfield that Paul would have to submit the counteroffer for ratification, all manifested AFTRA's tentative acceptance of the counteroffer subject to ratification. AFTRA also claimed that its actions after September 9 constituted acceptance. Since Warfield denied both his participation in any celebration and that Paul had ever made any statement to him about acceptance, Inner City argued that AFTRA had not accepted the counteroffer before it expired.

At the conclusion of the hearing, Judge Lowe orally delivered her findings of fact and conclusions of law. She determined that the issue before her was whether the parties had agreed on a contract containing an arbitration clause. She found that "the uncontroverted evidence [was] that the parties intended a written, not an oral, agreement," and that AFTRA had not "proven by a fair preponderance of the credible evidence that the parties entered into the contract intended by the parties on September 9, 1983."

Judge Lowe also found that there was "a direct controversy between the parties as to exactly what Mr. Warfield said at the September 9 bargaining session." The court did not decide, however, whether either AFTRA's version—that Warfield stated that the offer would be implemented at 5:00 p.m.—or Warfield's version—that the offer terminated at 5:00 p.m.—was "incredible."

Judge Lowe's conclusion that no agreement existed between the parties appears to rest on her finding that the parties intended to be bound only by a written, and not an oral, agreement. Thus, the issue before us is whether this finding is clearly erroneous. If so, we must remand for Judge Lowe to decide an issue she expressly left unresolved—whether Warfield's counteroffer terminated at 5:00 p.m. unless accepted, or whether it was open to later acceptance. If the counteroffer remained open, Judge Lowe must determine whether AFTRA's subsequent actions constituted a valid acceptance.

## DISCUSSION

■ Findings of fact shall not be set aside unless clearly erroneous. Fed.R. Civ.P. 52(a). Thus, unless we are left with the definite and firm conviction that a mistake has been committed, we must accept the trial court's findings. *Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 855, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982). The fact that some evidence supports the district judge's findings, however, does not preclude us from treating those findings as clearly erroneous. *Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 600 n. 5 (2d Cir.1983).

■ Since this action was brought under § 301(a) of the Federal Labor Management Relations Act, Judge Lowe's findings must be examined in light of federal substantive law, fashioned from the policy of our national labor laws. *See Textile Workers Union of America v. Lincoln Mills of Alabama*, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957). This policy encourages the formation of collective bargaining agreements, and the rule is well-established that technical rules of contract do

not control the question of whether a collective bargaining agreement has been reached. *Pepsi-Cola Bottling Co. v. NLRB*, 659 F.2d 87, 89 (8th Cir.1981). Thus, when the parties have agreed to the substantive terms and conditions of a contract, even though it may not have been reduced to writing, they can nevertheless be held to its terms. *NLRB v. New York-Keansburg-Long Branch Bus Co.*, 578 F.2d 472, 477 (3d Cir.1978). In fact, the failure of an employer to sign and acknowledge the existence of a collective bargaining agreement which has been negotiated and concluded on his behalf constitutes an unfair labor practice under 29 U.S.C. § 158(a). *NLRB v. Strong*, 393 U.S. 357, 359–62, 89 S.Ct. 541, 543–545, 21 L.Ed.2d 546 (1969).

Judge Lowe did note that there was "a line of cases in labor law that hold if the parties orally agree on the complete agreement, the agreement is made at that time." She declined to follow these cases here, however, in view of what she felt was uncontroverted evidence that the parties intended only a written agreement.

In support of this finding, Judge Lowe relied on: (1) unspecified portions of Roberts' testimony; (2) the fact that the parties negotiated from the expired agreements; (3) the fact that Paul subsequently sent drafts of the proposed new agreements to Warfield for execution; and (4) the fact that the parties referred to these as proposed drafts. Our review of Roberts's testimony discloses no statement on her part that suggests the parties intended to be bound only by a written contract. Similarly, the other evidence relied on by Judge Lowe indicates no more than that the parties intended eventually to reduce their agreement to writing. In view of the obligation of the parties under federal labor law to reduce an oral agreement to writing, we would be surprised *not* to find some references in the record to an intention eventually to execute a written contract.

In our view, the evidence strongly suggests that although the parties contemplated eventually reducing their agreement to writing, they first intended to enter into some sort of enforceable oral agreement. First, the counteroffer was made at approximately 2:15 p.m. on September 9, and, according to Warfield, was to remain open only until 5:00 p.m. Since the meeting ended at the earliest at 4:45 p.m., and there is no suggestion that the counteroffer had been withdrawn at that point, only 15 minutes remained in which AFTRA could have met the 5:00 p.m. deadline. It is unreasonable to assume that the parties contemplated that a written collective bargaining agreement could have been prepared and executed in those 15 minutes or even in the period between 2:15 p.m. and 5:00 p.m.

Moreover, Warfield's own testimony suggests that an oral acceptance was envisioned:

*The effective date of the contract would have been that day* —had the union responded positively to our proposal by five o'clock that day, we would have implemented effective that day a salary increase of 6½ percent each year of a three-year agreement, effective September 9, 1983. We had agreed—we would have agreed on an 8½ percent pension and welfare contribution, severance and discharge provision which had been—we were in the process of negotiating if it had been agreed to, it would have been effective. I believe—and the rest of the contract we would have put into effect these increases under the contract as far as percentage increase, *although we would not have had an agreement whereby language had been agreed to, not knowing how long that process would have taken.* [emphasis added]

Finally, Warfield's testimony in reference to the September 9 counteroffer that "the company position *up to that point had been* nothing would be paid until there had been an executed contract in effect" (emphasis added) suggests that Inner City changed course on September 9 and sought an oral acceptance.

Faced with such evidence that the parties did intend to be bound by an oral agree-

ment, and without persuasive evidence that the parties intended only a written contract, we are left with the definite and firm conviction that the district court erred in finding that the .parties intended to be bound only by a written agreement. Our conclusion gives relevance to certain questions of fact left unanswered by the district court. Thus, we remand this case to the district court to determine the duration of Warfield's counteroffer and whether it was accepted by AFTRA at any time before it expired or was withdrawn, and to conduct such other proceedings as may be appropriate.

We recognize that the district courts face considerable pressure from their overburdened calendars and that the practice of rendering oral findings of fact and conclusions of law can ease this pressure considerably. At the same time, however, we note that this practice occasionally forces needless review on appeal and leads to remands to establish overlooked facts. In this particular case, as in many recently before us, we suspect that had the omission been called to the attention of the district judge, it would have been a simple matter to amend or supplement the findings.

With this in mind, we urge all district judges to follow the practice of some judges, namely, after making an oral decision to give the parties a short time to review the findings and conclusions, and to suggest possible errors and omissions. Appropriate amendments at that point would undoubtedly avoid some needless appeals. The little additional effort by the district judges might not only significantly ease the burden on this court but also avoid corrective remands that require district judges to refamiliarize themselves with the case and sometimes even to retry it.

As to the preliminary injunction, affirmed. As to the arbitration claim, reversed and remanded for further proceedings consistent with this opinion.