TEAMSTERS, CHAUFFEURS, WARE-
HOUSEMEN AND HELPERS, LOCAL
UNION NO. 182, Plaintiff,

v.

NEW YORK STATE TEAMSTERS
COUNCIL HEALTH & HOSPITAL
FUND, and New York State Teamsters
Conference Pension & Retirement Fund,
Defendants.

No. 93–CV–1059.

United States District Court,
N.D. New York.

Dec. 29, 1995.

Baptiste & Wilder, P.C., Patrick Szymanski, Washington, DC, Satter & Connor, Mimi C. Satter, Syracuse, New York, for Plaintiff.

Morgan, Lewis & Bockius, Thomas K. Wotring, Kevin L. Wright, Washington, DC, Hancock & Estabrook, David Peebles, Syracuse, New York, for Defendants.

## MEMORANDUM–DECISION AND ORDER

POOLER, District Judge.

### INTRODUCTION

Plaintiff Teamsters Local Union No. 182 ("Local 182") has brought an action under 29 U.S.C. § 185 against the New York State Teamsters Council Health & Hospital Fund (the "Health Fund") and the New York State Teamsters Conference Pension and Retirement Fund (the "Retirement Fund") seeking a declaration that between April 1, 1992, and March 31, 1994, Local 182 had valid collective bargaining agreements with both the Health Fund and the Retirement Fund (collectively, "the Funds") and that these agreements required the parties to follow a grievance pro-

cedure that included arbitration. Local 182 also seeks an order requiring the Funds to arbitrate certain grievances that have arisen out of layoff decisions made by the Funds. Local 182 claims a long-standing oral agreement with the Funds to abide by certain provisions, most pertinently the seniority provision, of the National Master Freight Agreement and its Upstate New York Supplement (collectively, the "NMFA"). The facts surrounding the alleged negotiation of the agreement have been lost in the mists of time. The Funds therefore suggest that Local 182 can not establish that it ever negotiated a collective bargaining agreement with the Funds but that if such an agreement was ever reached, it no longer existed by the time the Funds made the layoffs in 1992. The Funds also urge that Local 182 cannot establish an agreement with the requisite definiteness. Because they believe there is no collective bargaining agreement between the Funds and Local 182, the Funds seek summary judgment dismissing the complaint based both on lack of subject matter jurisdiction and on Local 182's failure to demonstrate a material issue of fact on the existence of an agreement. I find that the court does have subject matter jurisdiction and that Local 182 has shown that there are genuine issues of material fact concerning the existence of a collective bargaining agreement between the parties. I therefore deny summary judgment.

## BACKGROUND

### I. Structure of the Funds and of Local 182

In support of their positions, both Local 182 and the Funds rely on statements from various union or management representatives. However, some of the actors in this controversy served both as representatives of the Funds and as representatives of Local 182. Therefore before turning to the history of this dispute, I examine the structure of the Funds and identify the various individuals who are alleged to have spoken for either the Funds or the Unions.

### A. The Funds

The Funds are multi-employer benefit plans governed by a board of trustees composed of equal numbers of employer and union representatives. Although the union maintains that the Funds' benefit plans should only be available to employees covered by collective bargaining agreements, the Funds have produced some evidence of inclusion of employers and employees not covered by collective bargaining agreements.

### B. Local 182

Local 182 is the statutory bargaining representative for non-supervisory employees of the Funds. According to Local 182, it has represented Funds' employees continuously since 1952.

### C. Union Representation on the Funds' Boards

The union representatives on the boards of the Funds have historically included officers of Local 182. From 1952, the date of the Funds' creation, through 1986, Rocco F. DePerno ("DePerno") served both as president and principal officer of Local 182 and as chairman of the board of trustees for the Funds. DePerno died in 1986. During 1987, Victor C. Olivadoti, then president and principal officer of Local 182, became a trustee for both funds. Olivadoti had served previously as Local 182's business representative from October 1975 through early 1986 and as its secretary-treasurer for a portion of 1986. He became president of Local 182 in October 1986. Olivadoti retired as both Local 182's president and a trustee for the Funds in 1993. Local 182 elected Terence F. Majka to replace Olivadoti as president. Majka, who had previously served both as secretary and business agent for Local 182, also joined the boards of trustees for the Funds.

### D. Funds Administrators

From March 1980 to September 1992, Alphonse Sgaglione, was the executive administrator for the Funds. He exercised responsibility for the day-to-day operations of the Funds and administered the terms and conditions of employment for Funds' employees. Josephine Russo assisted Sgaglione as assistant administratrix for the Health and Welfare Fund. Sgaglione was also assisted by

Lorraine Dawes. In late 1992, the Funds fired Sgaglione and hired A. Robert Scotti as an independent contractor to administer the Funds.

## II. The Alleged Agreement

Local 182 asserts that it and the Funds have agreed to be bound by "applicable" portions of the NMFA. The NMFA is a master collective bargaining agreement used by many Teamster Locals and by at least some of the employers participating in the Funds. The NMFA is negotiated every three years on a national basis, and Local 182 believes that the relationship of the parties during the period in controversy—1992–1993—was governed by the provisions of the 1988–1991 NMFA. By applicable portions, Local 182 means wage increases, seniority, vacations, holidays, jury duty, leaves, job posting and bidding, union security, dues checkoff, health and welfare coverage, pension and retirement provisions, and processing of grievances. Local 182 can point to no specific date on which the Funds and Local 182 negotiated an agreement to abide by the NMFA; nor can Local 182 describe the course of negotiations leading to the alleged agreement. No written agreement is claimed. Instead, Local 182 relies on statements that it contends are admissions over many years from various management representatives that the NMFA governed and a course of conduct that Local 182 claims shows that both parties knew that the NMFA governed and which portions of the NMFA governed. The Funds agree that many aspects of Funds' employees' work life were governed by the NMFA but argue that the conditions were nevertheless set unilaterally by the Funds' Trustees and not by collective bargaining between the parties. The Funds also contend that other aspects of employment such as wages did not track the NMFA. Irrespective of the existence of an agreement prior to April 1, 1988, the Funds contend that there is no evidence of the existence of an agreement to follow the 1988–1991 NMFA or any subsequent NMFA.

## III. The Continuation Clause

Article 39, § 1 to the 1988–1991 NMFA provides that "[t]his Agreement shall be in full force and effect from April 1, 1988, to and including March 31, 1991, and shall continue from year to year thereafter unless written notice of desire to cancel or terminate this Agreement is served by either party upon the other at least sixty (60) days prior to date of expiration." Majka Dep.Ex. B at 100. Because Local 182 never received written notice of termination of the 1988–1991 agreement, the Union contends that this agreement continued to bind the parties while they negotiated a new collective bargaining agreement during 1992 and 1993. The Funds concede that they sent no written notice of termination but argue that no notice was needed because the parties never agreed to be bound by the 1988–1991 NMFA. Local 182 claims that there were clauses similar to Article 39 § 1 in each of the preceding NMFA's but has not produced copies of those agreements.

## IV. The Participation Agreements

Every three years, the Funds and Local 182 signed a participation agreement that enabled the Funds as employer and the union to participate in the pension and insurance funds administered by the Funds. These agreements give effective dates for the beginning and end of the collective bargaining agreement in effect between the parties and identify the agreement as "Freight" and "National." The last such agreements produced to the court was signed by the Funds on September 15, 1988, and covered the period between April 1, 1988, and March 31, 1991. Local 182 offers the participation agreements as evidence that the parties had agreed to be bound by the NMFA.

## V. The Present Controversy

The first concrete indication that Local 182 and the Funds did not see eye-to-eye on the existence of a collective bargaining agreement requiring the parties to use "applicable" portions of the NMFA comes in the minutes of the September 19, 1988, Funds' Joint Trustees Meeting. The minutes state:

> Collective Bargaining Agreement; Following discussion, on a motion made and seconded, the Trustees unanimously approved

that the Health, Pension and Legal Benefit Funds will utilize the applicable provisions (without being bound by such provisions) of the National Master Freight Agreement, as guidelines for employee practices and policies.

Sgaglione Decl.Ex. C at 5, Agenda Item 11. Trustee and Local 182 president Olivadoti offered a correction to the minutes at the October 17, 1988, meeting. Olivadoti sought to have the minutes reflect that the Funds would not be bound by the "inapplicable" provisions of the NMFA instead of by "such" provisions of the NMFA. *Id.* Ex. E at 2, Agenda Item 3. Olivadoti's motion was tabled, and the minutes were later approved without correction at the November 28, 1988, trustees' meeting.

During 1990, Local 182 filed several grievances with the Funds. In response, Sgaglione denied the existence of a collective bargaining agreement. However, the Funds' joint board of trustees later met and considered six seniority grievances and one overtime grievance filed by Local 182 on behalf of Funds' employees. The board approved one of the grievances and changed the employee's seniority date and agreed to submit the remainder of the grievances to the Teamsters Joint Area Committee hearing scheduled for August 30, 1990. The Funds took the position before the Joint Area Committee that there was no collective bargaining agreement requiring the processing of grievances. The committee refused to hear the grievances because, Local 182 claims, it deadlocked, with the union representatives voting to hear the grievances and the management representatives voting not to hear them.

Majka states that "[f]ollowing the Committee's deadlock decision, Local 182 demanded that the Funds bargain with the Union to reduce the applicable terms of the NMFA to an integrated written document that would be signed by the parties." Majka Decl. ¶ 14. Internal documents from the board of trustees show references to collective bargaining much earlier than August 1990—when the Joint Area Committee Hearing was held—but the references are sketchy and ambiguous. Local 182 maintained, during the course of negotiations that it already had a

collective bargaining agreement. However, it did not maintain this position with perfect consistency. It appears, for example, that in a letter to the attorneys for certain individual union members that Majka said on June 22, 1993, "no contract is in effect." Def.Reply Mem.Ex. A. Local 182 and the Funds finally signed collective bargaining agreements in June 1994.

While negotiations were still ongoing, the Health Fund in 1992 determined to save money by contracting out the processing of certain claims. In implementing the changeover, the Health Fund laid off employees out of seniority. Local 182 filed grievances on behalf of the first several employees laid off out of seniority and then filed a blanket grievance. The Funds refused to process the grievances, asserting that they had no obligation to consider them because there was no collective bargaining agreement in effect between the parties. The Union then filed this action in August 1993. Several of the individual grievants have also filed hybrid breach of the duty of fair representation Section 301 actions against Local 182 and the Funds. *See Seminaro v. IBT Local 182,* 93–CV–1369; *Ferrio v. I.B.T. Local 182,* 94–CV–1069.

After discovery in this action, defendant Funds moved for summary judgment.

## DISCUSSION

The Funds argue the same basic legal theories and facts in support of two different bases for dismissal: dismissal for lack of subject matter jurisdiction because this court would have no jurisdiction under 29 U.S.C. § 185 absent a contract and dismissal on the merits because Local 182 cannot establish that its relationship with the Funds during 1992 and 1993 was governed by a collective bargaining agreement. Because this Circuit holds that a federal district court has subject matter jurisdiction under section 185 to determine whether a collective bargaining agreement exists, I reject the Funds' argument that this matter must be dismissed for lack of subject matter jurisdiction. *See Kozera v. Westchester–Fairfield Chapter of National Electrical Contractors Assoc.,* 909 F.2d 48, 52 (2d Cir.1990); *see also Mack*

*Trucks, Inc. v. Intern Union, UAW,* 856 F.2d 579, 590 (3d Cir.1988). I consider, in turn, therefore, the standards applicable to determining whether summary judgment is appropriate, the standards for determining whether a union and employer have a collective bargaining agreement, the factual allegations and admissions that the Funds urge show that there is no contract in effect; and the factual allegations and admissions that Local 182 claims show issues of fact as to the existence of a collective bargaining agreement. I conclude that Local 182 has demonstrated material issues of fact and therefore deny summary judgment.

## I. Summary Judgment Standard

▮▮▮▮ Summary judgment shall enter if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The materiality of facts must be determined · with reference to the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the initial responsibility of demonstrating that there is no genuine issue of material fact to be decided. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). As to any issue on which the moving party does not have the burden of proof, the moving party may satisfy its burden by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.

▮▮▮▮ "If the movant satisfies the burden of establishing that there is no genuine issue of material fact, then the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists." *Weg v. Macchiarola,* 995 F.2d 15, 18 (2d Cir.1993). In satisfying this burden, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The opponent of summary judgment "must do more than simply show that there is some metaphysical doubt as to

the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). "[M]erely colorable" evidence will not suffice as a basis for opposing summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

▮▮▮▮ In weighing a motion for summary judgment, the court must accept as true the non-moving party's evidence and make "all justifiable inferences" in the non-moving party's favor. *Id.* at 255, 106 S.Ct. at 2514. The evidentiary standard governing proof at trial determines how the court must assess the evidence in deciding whether the summary judgment standard has been met. *Id.* at 254–55, 106 S.Ct. at 2514. In an ordinary civil case, such as this one, where plaintiffs must prove their case by a preponderance of the evidence, the determinative standard is "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id.* at 252, 106 S.Ct. at 2512.

## II. Formation of a Collective Bargaining Agreement

▮▮▮▮ A collective bargaining agreement need not be in writing if the parties have agreed to its substantive terms. *American Federation of Television & Radio Artists, AFL–CIO v. Inner City Broadcasting Corp.,* 748 F.2d 884, 887 (2d Cir.1984). "[T]echnical rules of contract do not control the question of whether a collective bargaining *agreement has been* reached." *Id.* at 886–887. The determination is instead guided by federal substantive law, created in light of a policy that "encourages the formation of collective *bargaining agreements.*" *Id.* at 886. To determine whether a collective bargaining agreement exists, courts look to "surrounding circumstances and to the parties' 'conduct manifesting an intention to abide by agreed-upon terms.'" *Mack Trucks,* 856 F.2d at 592 (quoting *Bobbie Brooks, Inc. v. International Ladies Garment Workers' Union,* 835 F.2d 1164, 1168 (6th Cir.1987) (internal quotation omitted).

Local 182 relies heavily on the course of conduct between the parties in this matter to demonstrate that both the Funds and the

Union agreed in the 1950's to be bound by applicable provisions of the NMFA. Reduced to its simplest terms, the union's argument is that at some time in the 1950's the parties[1] agreed that they would follow the provisions of whatever NMFA was in effect to govern certain conditions of employment and that their course of conduct along with various alleged admissions by management representatives suffices to establish that this early agreement was, in fact, made. Although Local 182 concedes that it knew prior to the expiration of the 1988–1991 NMFA that the Funds did not consider themselves bound by the provisions of the NMFA, Local 182 argues that Article 39 § 2 of the NMFA (the "continuation clause") kept the 1988–1991 NMFA in effect unless and until one party revoked it in writing. The Funds, on the other hand, argue that conduct prior to 1988 is not relevant in assessing whether or not the parties agreed to the 1988–1991 NMFA. While disputing that there was an agreement in effect prior to 1988, the Funds argue that any such agreement had been terminated prior to April 1988 and is thus irrelevant to consideration of the 1988–1991[2] contract.

■ However, once the parties reach agreement on a collective bargaining agreement, they are required to adhere to the terms of that agreement—even after it expires—until they have bargained to impasse. *Caldwell v. American Basketball Ass'n*, 66 F.3d 523, 530 n. 2 (2d Cir.1995) (citing *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962)). As applied to this case, *Caldwell* means that if the Funds and the Union agreed in the past to follow the applicable provisions of whatever NMFA was in effect, this agreement would continue until

the parties bargained to impasse. Therefore, even without reference to the continuation clause, Local 182 may rely on conduct prior to 1988 to show the existence of an agreement that, once arrived at, would govern the parties relationship until they had bargained to impasse.

The Funds also contend that an agreement to be bound by the applicable provisions of the NMFA is too vague to constitute a collective bargaining agreement. Relying on *Caporale v. Mar Les, Inc.*, 656 F.2d 242, 245 (7th Cir.1981), the Funds argue that Local 182 cannot show the promised performance under the alleged collective bargaining agreement with reasonable certainty and therefore cannot establish the existence of a collective bargaining agreement. This contention must be viewed against the backdrop of the evidentiary submissions made on the terms of the alleged agreement and thus it is addressed in Part IV(E), *infra*.

### III. Affirmative Proof Offered by the Funds in Support of Its Motion

The Funds contend that Local 182 cannot establish the existence of a collective bargaining agreement to follow the terms of the 1988–1991 NMFA. I examine the adequacy of Local 182's showing in the following section. However, the Funds also contend that they have affirmatively shown that they were not bound to the 1988–1991 NMFA by their own proof. I examine the conclusiveness of that offering in this section.

■ First, the Funds point to the portion of the minutes of their September 19, 1988, joint trustees meeting showing that the Funds have agreed to utilize the "applicable provisions (without being bound by such pro-

1. The Funds, I believe, may oversimplify Local 182's position on negotiations by quoting the testimony of Terence Majka who said that he believed that DePerno authorized the agreement to follow NMFA on behalf of both the Funds and Local 182. Majka Dep.Tr. at 34. A fairer statement of the Local's position is that it does not claim to know what, if any, negotiations preceded the adoption of the alleged agreement but rather assumes that an agreement was reached because of the parties' course of conduct and statements, both written and oral, made by Funds' and union representatives over the years.

2. Neither party has provided a history of the bargaining relationship for the 1988–1991 or the 1991–1994 NMFA's. I do not know on what date or how either was terminated. Therefore, I do not consider what effect the lapse of the national agreement might have on the "carry-over" provision relied on by plaintiffs. *Compare Wilson and Sons Heating and Plumbing, Inc. v. NLRB*, 971 F.2d 758, 760–761 (D.C.Cir.1992) *with C.E.K. Industrial Mechanical Contractors, Inc. v. NLRB*, 921 F.2d 350, 355–56 (1st Cir. 1990).

visions)" of the NMFA as "guidelines." Sgaglione Decl.Ex. C. The Funds believe that this wording establishes that they did not intend to be bound by the 1988–1991 NMFA. However, subjective intent does not control the issue of whether a collective bargaining agreement had been reached by the parties. *See Warehousemen's Local No. 206 v. Continental Can Co.,* 821 F.2d 1348, 1350 (9th Cir.1987). The September 19, 1988, meeting also occurred long after Local 182 considers the Funds to have been bound by the 1988–1991 NMFA, which was effective in April 1988.

Next, the Funds point to evidence tending to show that despite Majka's assertion that the Funds had agreed to pay Local 182 employees at least the rates applicable under the NMFA, *see* Majka Dep. Tr. at 35–36, several pay rates were actually less than those set in the NMFA. *Compare* Majka Dep.Ex. B at 180–182 *with* Def.Mem.Ex. E.[3] The Funds also assert that all Funds employees received wage rate increases of 3.5% in 1988, 1989 and 1990 and that these increases were not specified in the 1988–91 NMFA. This information is some evidence that the parties did not agree—as Local 182 claims that they did—to wage rate increases in line with the NMFA. However, it is not controlling on the issue of whether they reached an agreement.

The Funds also rely on their conduct with respect to the 1990 grievances. In response to a request to hear the grievances, Sgaglione initially questioned the existence of a contract in a letter to Majka. Majka Dep. Ex. M. Although the board of trustees then heard the grievances and acted on one of them, the board subsequently repeated that there was no collective bargaining agreement in effect between the parties. Sgaglione Decl.Ex. A at 436–437; Majka Decl. ¶ 13. Again, Sgaglione's letter of May 17, 1990, which is the first indication in the record of a direct communication by the Funds to Local 182 that the Funds did not believe there was a collective bargaining agreement in effect, was sent long after the effective date of the 1988–91 NMFA. If there was indeed an agreement, as Local 182 urges, to follow

applicable provisions of the NMFA, it was binding on the Funds long prior to May 17, 1990.

Next, the Funds rely on a 1991 NLRB Advice Memorandum stating that the parties did not have a signed collective bargaining agreement. Def.Mem.Ex. G at 1. However, because Local 182 concedes the absence of a signed collective bargaining agreement, the probative force of the Advice Memorandum is not clear. Moreover, the record lacks foundation that would enable me to determine whether the Board's statement should have any issue preclusive effect.

Finally, the Funds rely on admissions made by Local 182 business agent Majka. The first of these is a memorandum to all Funds employees dated January 15, 1991. Def.Mem.Ex. A–C. In this memorandum, Majka refers to bargaining for the "first agreement" and notes that the parties do not have a signed collective bargaining agreement. *Id.* at C2. Majka also states, however, that he maintains that the NMFA has been the governing document over the years. Read in its entirety, the letter is equivocal. Majka explains that he meant to convey only that it would take longer than the ordinary collective bargaining process to reduce the applicable terms of the NMFA to a single integrated document. Majka Decl. ¶ 16. The second admission relied on by the Funds is not equivocal, but is also not offered in competent evidentiary form. In a letter dated June 22, 1993, to an attorney representing the plaintiffs in *Tebsherany,* Majka states "no contract is in effect." *See* Def. Rep.Mem.Ex. A. If offered with a proper foundation, this letter would provide significant support for the Funds' position. However, even if shown to be admissible, Majka's admission would not require the finder of fact to reject the existence of a collective bargaining agreement in light of Local 182's showing as described below.

### IV. *Local 182's Showing*

Local 182 relies on four separate categories of proposed evidence to support their allegation that the parties had agreed to be

---

**3.** These two exhibits do not appear to cover the same job titles.

bound by the applicable provisions of the NMFA: (1) statements made by Local 182 officials that were also Fund trustees; (2) statements made by Fund administrators; (3) the Funds' course of conduct in administering the terms and conditions of employment; and (4) participation agreements signed by Funds' representatives indicating that a collective bargaining agreement existed.

### A. Statements by Union Officials

Several Funds employees claim that DePerno and Olivadoti, both of whom served simultaneously as Fund trustees and union officials, repeatedly assured them that their terms and conditions of employment were governed by the NMFA. Olivadoti Decl. ¶¶ 3, 7; Gentile–Nanna Decl. ¶¶ 2–3; Nanna Decl. ¶¶ 4–5; Seminaro Dep.Tr. at 7–10. DePerno's dual role in this controversy causes particular problems. As a predominant figure in both Funds and Union management, DePerno repeatedly assured workers that they were covered by the NMFA. Workers, although relying on DePerno's assurances, have been generally unable to separate clearly statements DePerno made as chairman of the Funds' board of trustees from statements he made as Union president.

 The Funds argue that Local 182 cannot establish the existence of a contract through hearsay statements of union officials. Although admissions of a party opponent are not hearsay, Fed.R.Evid. 801(d)(2), Olivadoti and DePerno served in a dual capacity. Local 182 has not offered any foundation testimony that would indicate that the various statements attributed to Olivadoti and DePerno were made by them as trustees rather than as union officials. Therefore, Olivadoti and DePerno's statements are not admissible as admissions on this motion. I do not reach the larger issue of whether Local 182 could offer the statements of Olivadoti and DePerno if it provided a foundation showing they were speaking as Funds trustees.

 Local 182 also relies on records it maintains showing Funds employees as covered by the NMFA. Majka Decl. ¶ 7; Olivadoti Decl. ¶ 5. Although these records might be admissible as business records, see Fed.

R.Evid. 803(6), Local 182 has neither produced the records themselves nor set forth a foundation for their admission. Therefore, I do not consider them as admissible or probative on this motion.

### B. Statements by Funds' Administrators

The union relies on statements by various funds administrators to employees. The general nature of these statements was that the employees were covered by the NMFA. Victor Olivadoti states that while he was Local 182's business agent from 1975 through 1986, he discussed potential grievances and problems concerning employee working conditions and benefits with Funds administrators Sgaglione, Dawes, and Russo and that on each occasion the Funds representative acknowledged that the NMFA was the governing contract, and on each occasion the problem was resolved in accordance with the NMFA. Olivadoti Decl. ¶ 6. Lynn Seminaro, Patricia Tebsherany and Denise Leone, the plaintiffs in one of the companion suits, gave deposition testimony that management representatives had told them they were covered by the NMFA. Seminaro Dep.Tr. at 7–8; Tebsherany Dep.Tr. at 10; Leone Dep.Tr. at 9. Both Thomas Nanna and Marlene Gentile–Nanna supplied declarations in which they indicated that Sgaglione or Russo told them on repeated occasions that they were covered by the applicable provisions of the NMFA including seniority, vacation, sick leave, holidays and other benefits. Nanna Decl. ¶ 7; Gentile–Nanna Decl. ¶ 3.

### C. Terms and Conditions of Employment

Several employees and union officials claim that the Funds consistently used the NMFA to govern terms and conditions of employment. Majka states that "[t]hrough 1990, the Funds consistently applied the NMFA with respect to seniority, vacations (both how much vacation an employee was entitled to and how the actual timing of the vacation was determined), holidays (both regular holidays and "roving" holidays), jury duty, leave for a death in the family, leaves of absence, job

posting and bidding, sick leave, union security, dues checkoff, health & welfare coverage, and pension and retirement coverage." Majka Decl. ¶ 8. Majka also claimed that the Funds had to pay employees at least as much as the amounts specified in the NMFA. Majka Dep.Tr. at 35. Olivadoti supports Majka's claims with some minor variations as to wage adjustments. Olivadoti Decl. ¶¶ 4, 8. Olivadoti also describes an incident in the mid–1980's when the Funds attempted to restrict employees' rights under the NMFA to take roving holidays at any time they wished. *Id.* ¶ 14. The Funds, according to Olivadoti, attempted to restrict the employees to taking only one of the roving holidays during any sixty to ninety day period. When Olivadoti protested this practice to Lorraine Dawes, she said she would consult Funds' lawyers as to the correct interpretation of the NMFA. According to Olivadoti, after consulting the Funds lawyers, Dawes admitted she had incorrectly interpreted the NMFA and stopped the practice of restricting workers' use of their roving holidays. *Id.* Olivadoti states that this incident was consistent with the general practice when he was the business agent for the Local, i.e. potential grievances and problems were resolved between union and management by reference to the NMFA.

### D. The Participation Agreements

Local 182 relies on a series of participation agreements, signed by representatives of both Local 182 and the Funds, that authorize participation in the pension and health and welfare funds administered by the Funds. *See* Def.Mem.Ex. A. Each contains language that can be read to indicate that Local 182 and the Funds are parties to a collective bargaining agreement. The latest agreement, signed in September 1988, is typical. It states:

> This agreement shall continue in full force and effect for the same term as the Labor Agreement. A new Stipulation must be signed and submitted for each subsequent Collective Bargaining Agreement. Effective Date of Collective Bargaining Agreement *4/1/88* Expiration Date of Collective Bargaining Agreement *3/31/91*

*Id.*

The participation agreement also offers an opportunity for the parties to indicate which contract binds them. The parties to these agreements consistently indicated "Freight" and "National." *Id.*

Relying on *Caporale*, 656 F.2d at 245, the Funds argue that the participation agreements have no evidentiary value. In *Caporale*, the Seventh Circuit Court of Appeals reviewed evidentiary findings from a district court and affirmed the district court's finding that the employer and union had not agreed to a collective bargaining agreement. *Id.* at 243. The only fact alleged to support the existence of a collective bargaining agreement was the employer's signature on two memoranda of understanding that allowed one of its employees to participate in certain employee benefit funds. *Id.* In the memoranda, the employer recognized the union as the sole bargaining agent for all its employees and stated that certain collective bargaining agreements were incorporated by reference, and that the employer agreed to be bound by those agreements. *Id.* The benefit funds never furnished the employer with copies of the collective bargaining agreements; the employer, except for making the contributions to the benefit funds on behalf of its union employee, never followed the terms of the collective bargaining agreement, and the union never complained. *Id.* at 243–244. Under these circumstances, the district court held that the employer had not agreed to abide by the terms of a collective bargaining agreement it had never seen and the Circuit Court of Appeals affirmed. The procedural and substantive distinctions between *Caporale* and this case are patent. No claim was made in *Caporale* that the memoranda of understanding had no evidentiary value and they were, in fact, considered by the district court. The district court simply found the memoranda, after trial, to be insufficient to support the existence of a collective bargaining agreement in the face of the evidence (a) that the employer never received the agreement and (b) that the parties never abided by its terms. *Caporale* provides no support for refusing to consider the Funds' signing of the participation agreements as some evi-

dence of an agreement. Here, in addition, there is some evidence that the employer complied with most of the terms that Local 182 claims constitute the collective bargaining agreement.[4]

 The Funds also claim that the participation agreements were signed only so that Funds' employees could participate in the benefit plans and produce evidence that other employers that were not parties to collective bargaining agreements were allowed to participate in the benefit plans. The Funds are, of course, entitled to explain why they signed the participation agreements, but Local 182 is also entitled to have the participation agreements weighed as some evidence that the parties had entered into a collective bargaining agreement. *See* Fed.R.Evid. 801(d)(2). Neither the participation agreements themselves nor the Funds' explanation for signing them is conclusive.

### E. The Definiteness Issue

 Local 182 has produced relevant evidence that there was a collective bargaining agreement in effect between the parties. This evidence includes the participation agreements signed by the Funds, statements by Funds administrators, and conduct of the parties in accordance with the alleged collective bargaining agreement. However, remaining for consideration is the Funds' argument that the agreement fails for indefiniteness. As the discussion in part IV(C) indicates, Local 182 has produced evidentiary materials and sworn allegations that, if credited, would support a fact finder's determination that the parties agreed to certain specific and ascertainable terms from the NMFA as being the terms that governed certain aspects of their working relationship. Therefore, Local 182 has shown that material issues of fact exist, and the Funds request for summary judgment dismissing the complaint must be denied.

4. At least one court has subsequently questioned the validity of the holding in *Caporale.* *See Carpenters Fringe Benefit Funds of Illinois v. Able*

## CONCLUSION

Defendants' motion for summary judgment is denied in its entirety.

IT IS SO ORDERED.

*Bros. Construction, Inc.,* 813 F.Supp. 643, 648 (N.D.Illinois, E.D.1993).